Slip-Op. 00-160
# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

                                               :

**ALLIED TUBE AND CONDUIT CORP.**  :

                                               :

                   **Plaintiff,**   :

      v.                                    :      **Court No. 98-11-03135**

                                             :       **BEFORE: CARMAN, CHIEF JUDGE**

                                             :

**UNITED STATES,**                :

                                             :

                 **Defendant,**   :

    and                                 :

                                             :

**FERRO UNION, INC and**        :

**ASOMA CORPORATION**         :

                                             :

            **Defendant-Intervenors.**  :

_____:

[Plaintiff's Rule 56.2 motion for judgment on agency record is denied. Commerce's determinations are sustained.]

      Plaintiff moves for judgement on agency record pursuant to U.S. CIT R. 56.2, contending that it is entitled to judgement as a matter of law because, in the administrative proceeding below, the United States Department of Commerce, International Trade Administration (Commerce) incorrectly used the invoice date rather than the contract date as the date of sale for subject merchandise exported to the United States during the period of review. Plaintiff further maintains that Commerce improperly relied upon insufficient record evidence to support its decision not to collapse Saha Thai with Thai Tube Co., Ltd. (Thai Tube) and Thai Hong Steel Pipe Import-Export Co., Ltd (Thai Hong) (collectively, Affiliated Companies). Plaintiff asserts that Commerce's actions are unsupported by substantial evidence on the record and otherwise not in accordance with law.

      The United States (Defendant) and Fero Union, Inc. and Asoma Corporation (Defendant-Intervenors) (collectively, Defendants), oppose Plaintiff's motion arguing the determination is supported by substantial evidence on the record and otherwise in accordance with law.

      *Held*: This Court holds that Commerce's determinations are supported by substantial evidence on the record and are otherwise in accordance with law.

                               Dated: December 12, 2000

*Schagrin Associates* (*Roger B. Schagrin*), Washington, D.C., for Plaintiffs.

*David W. Ogden*, Assistant Attorney General of the United States; *David M. Cohen*, Director; *Katherine A. Barski*, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Brian Peck*, Attorney Advisor, Office of the Chief Counsel, United States Department of Commerce, of Counsel, for Defendant.

*Mayer, Brown, & Platt* (Simeon M. Kriesberg, Carol J. Bilezi, Peter C. Choharis, Andrew A. Nicely), Washington, D.C., for Defendant-Intervenors.

## OPINION

**CARMAN, CHIEF JUDGE:** Plaintiff moves for judgement on agency record pursuant to U.S. CIT R. 56.2., contending it is entitled to judgement as a matter of law because, in the administrative proceeding below, Commerce, rendered two decisions that were unsupported by record evidence and were otherwise not in accordance with law. *Certain Welded Carbon Steel Pipes and Tubes from Thailand,* 63 Fed. Reg. 55578 (October 16, 1998) (*Final Results*). First, Plaintiff asserts Commerce incorrectly used the invoice date rather than the contract date as the date of sale for subject merchandise exported to the United States during the period of review. In the administrative proceeding below, Plaintiff claimed this resulted in: (1) the evaluation of export sales that did not actually take place during the period of review; (2) the distortion of the true value of these exports due to the currency devaluation present in Thailand at the time the evaluated sales occurred; and (3) the distortion of the dumping margin. *See Final Results*, 63 Fed. Reg. at 55587. Second, Plaintiff asserts that Commerce based its decision not to collapse the Affiliated Companies on insufficient record evidence. Defendants oppose Plaintiff's motion.

## BACKGROUND

On April 24, 1997, Commerce initiated an administrative review of antidumping orders

covering certain welded carbon steel pipes and tubes[1] that were imported from Thailand between

March 1, 1996 and February 29, 1997. *See Initiation of Antidumping and Countervailing Duty

Administrative Reviews*, 62 Fed. Reg. 19988 (April 24, 1997). Pursuant to this review,

Commerce sent Saha Thai questionnaires seeking information pertaining to, *inter alia*, the dates

of sale for all exports of subject merchandise to the United States.[2] Commerce also sent each of

the Affiliated Companies questionnaires relating to the interlocking nature of their business

relationship. Saha Thai was the only Affiliated Company to respond to Commerce's

questionnaires. Commerce verified the information provided by Saha Thai and, in doing so,

generated additional evidence from both Saha Thai's corporate records and interviews with

several Saha Thai managers. Based upon the totality of this evidence, Commerce made three

findings relevant to this case. First, Commerce found that, because Saha Thai's export sales

were frequently subjected to quantity changes greater than those permitted by contract, the

material terms of sale were not actually finalized until the date of invoice. *See Final Results*, 63

Fed. Reg. at 55587. As such, the invoice date was the true date of sale for subject merchandise

exported to the United States during the period of review. Second, Commerce found that there

was sufficient record evidence upon which to base its collapsing decision, thereby negating the

need to rely upon alternative facts available. *See id.* Third, based upon the record evidence

Commerce found that the Affiliated Companies did not present a significant potential for price or

---

[1] The subject merchandise consisted of welded carbon steel pipes possessing an outside diameter of at least 0.375 inches, but not exceeding 16 inches.

[2] Of the three companies, Saha Thai was the only one found to export subject merchandise into the United States and, thus, the only of the three companies subject to the antidumping order. As is discussed below, Thai Hong, and Thai Tube were relevant to this administrative review because Commerce determined them to be affiliated producers under 19 U.S.C. § 1677(33)(f). This finding potentially rendered these companies subject to a "collapsing" determination pursuant to 19 C.F.R. 351.401(f)(1).

production manipulation and, therefore, should not be collapsed. *See id.*

On December 8, 1999, Plaintiff timely filed a complaint with this Court challenging: (1) Commerce's use of invoice date as opposed to contract date as the date of sale for subject merchandise entered during the period of review; (2) Commerce's refusal to collapse the Affiliated Companies; (3) Commerce's failure to utilize alternative facts available against the Affiliated Companies; and (4) Commerce's refusal to use draw an adverse inference from these alternatively available facts. On April 27, 1999, Plaintiff filed a motion for judgement on agency record pursuant to U.S. CIT R. 56.2, to which the Defendants objected. Both the underlying litigation and this motion are properly before this Court pursuant to 28 U.S.C. § 1581(c) and sections 516(a)(2)(A) and (B)(iii) of the Tariff Act of 1930, 19 U.S.C. §§ 1301, *et seq.,* as amended by, 19 U.S.C.§§ 1516(a)(2)(A) and (B)(iii) (Tariff Act).

CONTENTIONS OF THE PARTIES

A.      Plaintiff's Contentions

Plaintiff contends that Commerce's decisions are unsupported by substantial evidence and are otherwise not in accordance with law. The following sections detail each of the Plaintiff's contentions individually.

1.      Date of Sale:

Plaintiff makes two arguments with respect to the appropriate date of sale: (1) because the material terms of sale were established by contract, the use of invoice date rather than contract date as the date of sale is contrary to law and to Commerce's regulations; (2) the record lacks substantial evidence to support Commerce's finding that changes frequently were made beyond the contractually agreed quantity tolerance levels. Plaintiff argues the record clearly

demonstrates that the contract date better reflects the date on which the material terms of sale were established and, thus, Commerce should have found that the contract date is the appropriate date of sale.

(a)    *The Date of Sale is the Date on Which the Material Terms of Sale are Established*:

At the time of the administrative review, Commerce's date of sale determination was guided by its then current practice and a proposed regulation that was designed to codify this practice. *See* 19 C.F.R.§ 351.401(i).[3] Both Commerce's practice and its proposed regulation established invoice date as the presumptive date of sale. Relying on its finding that Saha Thai's export sales frequently were subject to quantity changes greater than that permitted by contract, Commerce determined that there was no reason to deviate from its presumptive use of invoice date as the date of sale. Accordingly, Commerce determined that the invoice date was the appropriate date on which to base its comparison of Saha Thai's home market and export sales.

Plaintiff argues that this determination was improper. Although acknowledging that Commerce's practice during the period of review was to presumptively use the invoice date as the date of sale, Plaintiff argues that this presumption should be disregarded if a different date "*better reflect*[*ed*] the date on which the exporter or producer establishes the material terms of sale." 19 C.F.R. §351.401(i) (emphasis added). Plaintiff notes that although Commerce "prefers to use invoice date as the date of sale," it is "mindful that this preference does not require the use

---

[3] Although 19 C.F.R. §351.401(i) had not yet officially been adopted during the period of review, it was proposed and cited as a reflection of Commerce's then current practice.

19 C.F.R. § 351.401(i): *Date of Sale*: In identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

of invoice date if the facts of the case indicate a different date better reflects the time at which the material terms of sale were established." *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 63 Fed. Reg. 32833, 32835 (June 16, 1998). Rather, "both the Proposed and Final Regulations speak to giving the Department flexibility to abandon the use of invoice date." *Id.* Thus, instead of simply adhering to the invoice date as the presumptive date of sale, Plaintiff argues that Commerce should have established the date of sale as the date on which the essential terms of the sale, specifically quantity and price, were actually finalized. *Al Tech Specialty Steel Corp. v. United States*, Consol. Court No. 97-08-01328, Slip Op. 98-136 (Ct. Int'l Trade Sept. 24, 1998).

In support of its argument, Plaintiff notes that Commerce has frequently deviated from the presumptive use of invoice date as the date of sale where the facts required. Specifically, where the facts demonstrated that "[first] price and quantity are established, then the factory produces the subject merchandise, and finally, after a significant period of time, the product is shipped and an invoice is issued," Commerce has regularly held the contract date to be the actual date of sale. *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 62 Fed. Reg. 64559, 64560 (Dec. 8, 1997). In such cases, Plaintiff argues Commerce has consistently instructed respondents to "report as the date of sale the date that will reasonably approximate the time at which the material terms of sale are set." *Id.*

In sum, Plaintiff argues that neither Commerce's prior practice nor its proposed regulation requires the invoice date be used as the date of sale. Rather, Commerce is free to disregard the invoice date where it can be demonstrated that the essential terms of sale were established on a different date. Plaintiff argues, in the present case, the essential terms of sale were established on the contract date.

(b)     *The Record Evidence is Insufficient to Support a Finding that Date of Invoice is the Proper Date of Sale:*

As stated, Plaintiff argues Commerce is not required to use the invoice date as the date of sale if "satisfactory evidence" demonstrates that the material terms of sale are established on a different date. Plaintiff contends the record provides more than satisfactory evidence that the material terms of sale were established on the contract date.

Plaintiff's argument centers on the information and documents submitted to Commerce by Saha Thai. In addition to providing questionnaire responses, Saha Thai provided Commerce with a sample contract and related sales documents. Plaintiff challenges Commerce's analysis of these documents and questions the factual findings and legal conclusions drawn therefrom. Specifically, Plaintiff challenges Commerce's finding that a significant percentage of Saha Thai's sales involved quantity changes greater than those permitted by the sales contracts. Plaintiff further challenges Commerce's conclusions that "changes frequently were made beyond the agreed upon quantity tolerance levels" and, that the material terms of sale were not established until the invoice date. *Final Results*, 63 Fed. Reg. at 55588.

Plaintiff's challenges rest on two closely related grounds. First, Plaintiff argues that Commerce misinterpreted Saha Thai's documents and this misinterpretation resulted in an overestimation of the number of sales that experienced quantity changes. Plaintiff argues that, in reality, the record demonstrates a far smaller percentage of Saha Thai's sales possessed quantity changes greater than those permitted by contract. Because the vast majority of Saha Thai's export sales experienced either no quantity changes or changes within contractually permissible tolerances, Plaintiff argues that the material elements of sale were clearly established on the original date of contract.

Second, Plaintiff argues that even if Commerce's calculations were correct, the percentage of sales containing quantity changes outside the contractual tolerances was legally insignificant. Plaintiff argues that, as a matter of law, where the price is firmly established on the contract date in virtually all sales and the quantity is firmly established on the contract date in a substantial majority of sales, the essential elements of sale are established on the contract date. Because the record "overwhelming[ly] indicates that contract date better reflects the date of sale," Plaintiff argues that Commerce's decision to use invoice date as the date of sale for subject merchandise exported to the United States was unsupported by substantial evidence on the record and otherwise not in accordance with law.

2. <u>Collapsing and Use of Facts Available</u>:

Commerce found Saha Thai, Thai Tube, and Thai Hong to be Affiliated Companies under the terms of under 19 U.S.C. § 1677(33)(f). This affiliation was due in large part to the Lamatipanont family's predominant control over each of these companies. *See Certain Welded Carbon Steel Pipes and Tubes from Thailand,* 63 Fed. Reg. 16974, 16975 (April 7, 1998). As a result of this finding, and pursuant to 19 C.F.R. § 351.401(f)(1) (1997),[4] Commerce examined

---

[4] 19 C.F.R. § 351.401(f):

    (1)    *In General*: In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.

    (2)    *Significant Potential for Manipulation*: In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:
        (i)    the level of common ownership;
        (ii)    the extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
        (iii)    whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

whether this affiliation created a significant potential for price or production manipulation and, therefore, whether these companies should be treated as a single entity for purposes of calculating an antidumping duty margin.

Commerce sent each of the Affiliated Companies questionnaires requesting detailed information regarding their business relationships. *See* Memorandum from John Totaro to File, March 31, 1998, "*Analysis of Saha Thai Steel Pipe Co., Ltd's ("Saha Thai") Affiliation with Certain Thai Steel Pipe Producers and the Propriety of Collapsing Saha Thai and these Entities*", Plaintiff's Appendix, at 99. Neither Thai Hong, nor Thai Tube responded to Commerce's questionnaires within the prescribed time period. *See id.* at 110. Saha Thai responded to Commerce's questionnaires providing, where possible, the requested information. *See Final Results* 63 Fed. Reg. at 55587.

From this information, Commerce found no evidence of commercial transactions or intertwined operations between the Affiliated Companies that warranted their collapsing. *See id.* Commerce, therefore, concluded that even in the absence of Thai Hong and Thai Tube's questionnaire responses a determination not to collapse the Affiliated Companies could be made on the basis of the record evidence. Plaintiff challenges Commerce's decision not to collapse the Affiliated Companies. Specifically, Plaintiff argues: (1) the record evidence is insufficient to support Commerce's decision not to collapse the Affiliated Companies; (2) because of the record's insufficiency, Commerce was statutorily required to make a facts available determination against Thai Tube and Thai Hong; and (3) had Commerce utilized facts available against these companies they would have been collapsed for purposes of calculating the dumping margin. This section sets forth these arguments.

    (a)     *The Record Lacks Substantial Evidence to Support the Department's Decision Not to Collapse the Affiliated Companies*

Plaintiff argues that, pursuant to both historical practice and proposed regulation, Commerce consistently treated two or more affiliated producers as a single entity where they have production facilities for similar or identical goods that would not require substantial retooling of either facility in order to restructure manufacturing priorities and where Commerce concluded there is a significant potential for price or production manipulation. *See* 19 C.F.R. §351.401(f)(1).[5] Plaintiff notes that when Commerce determines whether a significant potential for price or production manipulation exists it considers: (1) the level of common ownership; (2) the extent to which managerial employees or board members of one firm sit on the board of an affiliated firm; and (3) whether operations are intertwined such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between affiliated producers. *See* 19 C.F.R. §351.401(f)(2).

Plaintiff argues the record clearly establishes that each of the three requirements necessary for an affirmative collapsing determination is present. Plaintiff notes Commerce not only conceded that there is common control among the Affiliated Companies, but found that the Lamatipanont family held certain key positions in each of these companies. Plaintiff further argues that the overarching control of the Lamatipanont family of the Affiliated Companies creates a significant potential for price or production manipulation. Thus, Plaintiff argues that each of the prerequisites to collapsing was present and Commerce should have collapsed the Affiliated Companies.

---

[5] Although 19 C.F.R. §351.401(f)(2) was not officially promulgated during the period of review, it was proposed

     (b)     *Because the Record is Insufficient, Commerce was Required to Utilize Facts Available Against Thai Hong and Thai Tube*

Plaintiff argues that the record is insufficient to support Commerce's decision not to collapse the Affiliated Companies. Plaintiff urges that Commerce is statutorily required to use facts available where necessary information is not present in the record, or a relevant party either withholds requested information, fails to provide such information in the manner or time requested, significantly impedes a proceeding, or provides information that cannot be verified. *See* 19 U.S.C. §1677e(a) (1994).

Because Saha Thai's information was insufficient to support a negative collapsing determination, Plaintiff argues that Commerce was required to look to alternative sources of information to fill in the gaps. These alternative sources of information should have been Thai Tube and Thai Hong's questionnaire responses. As stated, neither Thai Hong nor Thai Tube responded to Commerce's questionnaire. Plaintiff, therefore, argues that Commerce should have used alternative facts available as mandated in 19 U.S.C. §1677e(a).

     (c)     *Had Commerce Used Facts Available Against the Affiliated Companies it Would Have Drawn a Negative Inference Therefrom, and Consistent with Precedent Collapsed the Affiliated Companies*

Plaintiff acknowledges Commerce possesses discretion in its collapsing decisions and that these decisions are "very much fact specific in nature, requiring a case-by-case analysis." Plaintiff argues, however, that in the 1995-1996 administrative review of the same antidumping order Commerce was faced with a similar factual scenario. Commerce had requested information regarding the nature and scope of the relationship among the same Affiliated Companies. Commerce received information pertaining solely to Saha Thai. As a result,

---

and reflected Commerce's collapsing practice.

Commerce determined that there was insufficient record evidence to render a collapsing decision and resorted to alternative facts available. From these facts, Commerce determined that a significant potential for price or production manipulation existed and, therefore, collapsed the Affiliated Companies.

Plaintiff argues that had Commerce used facts available against the Affiliated Companies in the present dispute, it would have relied not only upon the same or similar information as it did in the 1995-1996 review but also the prior affirmative collapsing determination to support a finding in the present case. Plaintiff argues that had Commerce relied upon this information it would have reached the same conclusion – the Affiliated Companies should have been collapsed. Failure to do so, Plaintiff argues, is not in accordance with law and is an abuse of discretion.

B.    Defendants' Contentions

Defendant's argue two points in support of Commerce's final determination: (1) Commerce's date of sale determination must be afforded deference because it is a reasonable interpretation of its statutory obligation; and (2) Commerce's decisions are supported by substantial evidence on the record and are otherwise in accordance with law. These arguments are set forth below.

1.    Commerce's Decisions Should be Accorded Deference

Defendants argue that Commerce's determination should be afforded deference. Specifically, Defendants argue that in the area of antidumping, courts must accord Commerce's determinations substantial deference because Commerce is "the 'master' of antidumping law." *Daewoo Elec. Co., Ltd.  v. International Union*, 6 F.3d 1511, 1516 (Fed. Cir. 1993). As such, Defendants argue this Court must be guided by *Chevron, U.S.A., Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837 (1984), when determining the lawfulness of an agency's statutory interpretation.

Defendant's note that the antidumping statute does not indicate the exact date of sale Commerce is to use when calculating an antidumping margin. The relevant provision states only that "normal value" shall be the price "at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price." 19 U.S.C. §1677b(a)(1)(A) (1994). Because the Tariff Act provides little guidance as to the appropriate standard by which Commerce should determine the date of sale, Defendants argue that Commerce's presumptive use of invoice date is a reasonable interpretation of the antidumping statute's requirements.

Defendants acknowledge that the Commerce's presumptive use of invoice date was an evolutionary change from its prior practice. Defendants argue, however, that this change was recognized as a necessary response to the inherent problems of its prior practice.[6] *See Proposed Rulemaking* at 7330. As such, Defendants argue that Commerce's presumptive use of invoice date as the date of sale was a reasonable interpretation of the Tariff Act's requirements.

> 2.    Commerce's Decisions are Supported by Substantial Evidence and are Otherwise in Accordance with Law
>
> (a)    *Date of Sale:*

Defendants argue that the record evidence clearly supports Commerce's decision to use invoice date as the date of sale for Saha Thai's U.S. sales. Where price and quantity terms are subject to change after the contract date, Defendants argue Commerce has consistently relied upon the invoice date as the date of sale. *See Stainless Steel Sheet and Strips in Coils from*

---

[6] The problems associated with this practice are discussed more fully *infra* at pp. 18-19.

*Japan*, 64 Fed. Reg. 30574, 30587 (June 8, 1999); *Stainless Steel Plate in Coils from Belgium*, 64 Fed. Reg. 15476, 15481-82 (March 31, 1999).  In the present case, Defendants note that Saha Thai provided a sample contract and accompanying sales documents that Commerce found to be a representative sample of the sales made by Saha Thai during the period of review.  From these documents, Commerce found that Saha Thai's export sales frequently underwent quantity changes greater than those permitted by the sales contract and that these changes were reflected only in the invoice.  *See Id*.  Defendant argues that this finding establishes that the essential elements of sale were finalized after the contract date and that, when combined with the fact that Saha Thai customarily recorded the invoice date as the date of sale in its financial records, provides substantial evidence supporting Commerce's determination.

(b)      *Collapsing and the Use of Facts Available*:

Defendants argue that the law restricts Commerce's ability to collapse parties to a narrow set of circumstances.  Before Commerce may collapse two or more parties, it must determine that: (1) the parties are affiliated; (2) each party has similar or identical production facilities that would not require substantial retooling in order to restructure their manufacturing priorities; and (3) the nature of the parties' relationship creates a significant potential for price or production manipulation.  In the present case, Defendants argue that the record clearly supports Commerce's decision not to collapse the Affiliated Companies.

Although Defendants acknowledge that Commerce found common control and similar production facilities among the three companies, they emphasize that Commerce found that there did not exist a *significant* potential for price or production manipulation.  Defendants argue that Commerce's finding is particularly important because both Commerce's regulations and this Court's precedent preclude an affirmative collapsing determination unless the potential

for price or production manipulation is *significant*. Defendants argue that affiliated entities can only be collapsed in "relatively unusual situations, where the type and degree of relationship is so significant that [the Court] find[s] there is a strong possibility of price manipulation." *Nihon Cement Co. v. United States*, 17 CIT 400, 426-27 (1993), *quoting, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany*, 54 Fed. Reg. 18992, 19089 (May 3, 1989). Defendants argue the present case is not an "unusual situation" and that the record clearly supports Commerce's determination not to collapse the affiliated entities.

Finally, Defendants argue that Commerce's prior decision to collapse the Affiliated Companies in the 1995-1996 administrative review did not create a precedent applicable to the present case because the facts surrounding the two reviews differ substantially. In the 1995-1996 review, Commerce sent Saha Thai questionnaires requesting information regarding its own business practices as well as specific information about its two Affiliated Companies. Commerce did not send questionnaires directly to either of the other Affiliated Companies. Saha Thai failed to respond to Commerce's questionnaires. As a result, Commerce found that Saha Thai had impeded its investigation and, therefore, utilized alternative facts available to make its collapsing determination. In the present case, Commerce directed questionnaires to each of the Affiliated Companies individually. Saha Thai responded to these questionnaires and provided information regarding its sales process, its relationship with Affiliated Companies, and relevant publicly available information about these companies. Based on the information provided, Commerce determined that Saha Thai cooperated fully with its investigation, and provided sufficient evidence to make an informed negative collapsing determination.

**STANDARD OF REVIEW**

This Court will sustain a final determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i) (1994). Substantial evidence is more than a "mere scintilla" of evidence. *Primary Steel, Inc. v. United States*, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993). It consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

**DISCUSSION**

A.   Deference Should Be Accorded to Commerce's Date of Sale Determination

In determining whether Commerce's interpretation and application of the antidumping statute is in accordance with law, this Court must consider whether the statute addressed the specific question at issue, and if not, whether the agency's statutory interpretation is reasonable in light of the overall statutory scheme. *See Chevron*, 467 U.S. at 842-43. Although considerable weight must be accorded to Commerce's construction of the antidumping statute, s*ee E.I. DuPont De Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 858 (Ct. Int'l Trade 1998), this Court does not fulfill its duty to say what the law is by perfunctorily agreeing with Commerce's interpretation of the statutory provision at issue. *See Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998). Rather, through application of the traditional tools of statutory construction, this Court must thoroughly examine whether Congress expressed intent on the matter at issue. Only if it is determined that Congress was silent or ambiguous with respect to the question at issue can this Court assess whether Commerce's construction thereof is

reasonable or whether it is merely a *post hoc* rationalization. *See id.* at 882. To survive judicial scrutiny, however, "an agency's construction need not be the *only* reasonable interpretation or even the *most* reasonable interpretation… [A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *U.S. Steel Group v. United States*, 225 F.3d 1284, 1287 (Fed. Cir. 2000); *NSK Ltd. v. United States,* 115 F.3d 965, 973 (Fed. Cir. 1997); *Koyo Seiko co., Ltd. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (internal citation omitted) (emphasis in original).

1.     Congressional Intent:

This Court must first look to the express language of the antidumping statute to determine the presence of congressional intent. *See Chevron*, 467 U.S. at 842-43. Where this language is unambiguous and speaks directly to the issue in question, it will be deemed an explicit expression of Congressional intent and, thus, controlling. *See id.* at 843. Where, however, the language is ambiguous or silent, it is necessary to look to the statute's legislative history to determine the existence of Congressional intent. *See id.*

As indicated by Defendants, the Tariff Act is silent regarding the appropriate date of sale for purposes of calculating antidumping duty margins. The relevant provision states only that "export price means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation…." 19 U.S.C. §1677a(a). Similarly, 19 U.S.C. §1677b(a)(1)(A) provides that the normal value of the subject merchandise shall be the price "at a time reasonably corresponding to the time of sale used to determine the export price… under section 1677a(a).…" The language in these provisions makes clear that Congress did not specifically address the date of sale issue. Rather, the only affirmative guidance found in these provisions is that date of sale must occur prior to the importation date of the subject merchandise.

In 1994, however, Congress passed the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) (URAA), and, in doing so, incorporated the trade agreements adopted by the World Trade Organization at the Uruguay Round negotiations into United States law. Congress explained the relationship of these agreements to United States law in 19 U.S.C. §3512. Most relevant to this case, Congress noted in 19 U.S.C. §3512(d) that the statement of administrative action (SAA)[7] promulgated in conjunction with the Uruguay Round Agreements "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning interpretation or application." The Federal Circuit and this Court have recognized the controlling nature of the SAA and have used it as an authoritative guide in interpreting the Uruguay Round Agreements. *See e.g., AK Steel Corp. v. United States*, 226 F.3d 1361, 1368-69 (Fed. Cir. 2000); *U.S. Steel Group v. United States*, 225 F.3d 1284, 1288, fn. 1 (Fed. Cir. 2000); *SNR Roulements v. United States*, 118 F. Supp.2d 1333, 1342, fn. 3 (Ct. Int'l Trade 2000); *SKF USA, Inc. v. United States*, 118 F. Supp.2d 1315, 1321, fn. 2 (Ct. Int'l Trade 2000).

The Uruguay Round Agreements state that "normally, the date of sale would be the date of contract, purchase order, order confirmation or invoice, whichever establishes the material terms of sale." *Agreement on the Implementation of Article VI of the General Agreements on Tariffs and Trade 1994*, Article 2.4.1, fn. 8. The language of this provision is unambiguous – the date of sale is to be the date on which the material terms of sale are established. Similarly, the SAA unambiguously provides that the date of sale is the "date when the material terms of sale

---

[7] The SAA is a document prepared by the WTO for the purpose of interpreting and explaining the provisions of the Uruguay Round Agreement.

are established." H.R. Rep. No. 103-316, vol. 1 at 810 (1994). Because Congress has stated that the SAA constitutes an authoritative expression concerning the application and interpretation of the Uruguay Round Agreements in any judicial proceeding, this provision constitutes evidence of Congress' intent regarding Commerce's date of sale determination. Thus, this Court must determine whether Commerce's date of sale policy and its actions in the present case are consistent with the Uruguay Round Agreements' requirements and Congress' intent.

2.   Consistency of Commerce's Date of Sale Determination with the Uruguay Round Agreements and Congressional Intent

When a statute has clearly and explicitly addressed the legal question at issue or Congress has expressed unambiguous intent regarding a specific statutory provision, administrative agencies must give effect to Congress' desires. *See Chevron*, 467 U.S. at 842-43. Even in the face of unambiguous language, however, agencies are charged with interpreting a statute's requirements and implementing a course of action that is in conformity with those requirements. The courts serve as the final authority on issues of statutory construction. *See id.* at 843, fn. 9. Hence, when either an agency's actions or regulations are challenged as contrary to its statutory mandate, the courts must determine the extent to which these actions and regulations run afoul of the agency's legal obligations. When an agency's actions or regulations are contrary to either the unambiguous language of a statute or clear congressional intent, they must be rejected. *See id.*

Prior to the enactment of the URAA, Commerce's regulations did not speak directly to the Agency's date of sale determination. Rather, Commerce's customary practice dictated that the date of sale was the date the evidence established as finalizing the material elements of sale. Historically, this practice was plagued with significant problems – *i.e.* "delayed proceedings, increased … cost[s] to the respondents, complicated verification, and… unpredictab[ility]."

*Antidumping Duties; Countervailing Duties – Notice of Proposed Rulemaking and Request for Public Comments*, 61 Fed. Reg. 7308, 7330 (February 27, 1996) (*Proposed Rulemaking*). With the passage of the URAA, Commerce's practice evolved in a manner designed to correct these problems and to reflect Tariff Act's requirements, as amended by the URAA.[8] *See Final Results, 63 Fed. Reg. at 55579. See also Certain Internal Combustion Industrial Forklift Trucks from Japan*, 62 Fed. Reg. 5592, 5611 (February 6, 1997); *Tapered Roller Ball Bearings and Parts Thereof (Finished and Unfinished) from Japan and Tapered Roller Bearings (Four Inches or Less in Outside Diameter) and Components Thereof, from Japan*, 62 Fed. Reg. 11825, 11843 (March 13, 1997). Commerce promulgated 19 C.F.R. § 351.401(i) both to codify its practice and to formally bring this practice into conformity with the URAA's statutory obligations. *See Proposed Rulemaking*, 61 Fed. Reg. at 7330; 19 C.F.R. §351.701 (1998).

Commerce justified both its evolved practice and its proposed regulation on the basis of administrative efficiency and commercial practicality. Specifically, Commerce asserted that "the use of a uniform date of sale makes more efficient use of the Department's resources and increases the predictability of outcomes." *Antidumping Duties; Countervailing Duties - Final Rule*, 62 Fed. Reg. 27296, 27348 (May 19, 1997) (*Final Rule)*. Moreover, Commerce recognized that in many industries price and quantity remain subject to change despite the presence of a preliminary sales agreement. Hence, "a preliminary agreement on terms, even if reduced to writing, in an industry where re-negotiation is common does not provide any reliable

---

[8] For proceedings conducted between January 1, 1995 and July 1, 1997, Commerce regarded part 351 of 19 C.F.R. as a "restatement of the Department's interpretation of the requirements of the [Tariff] Act as amended by the URAA." 19 C.F.R. §351.701. Though Commerce cites this policy as a reflection of its then current practice and as its interpretation of its statutory mandate, the Court notes the evolving nature of Commerce's practice during this time period. In *Proposed Rulemaking*, 61 Fed. Reg. at 7330, Commerce stated that "this is a change from prior practice under which the Department based the date of sale on which the essential terms of sale (normally price and quantity) were established".

indication that the terms are truly 'established' in the minds of the buyer and seller." *Id.* at

23749. "This holds true even if, for a particular sale, the terms were not renegotiated." *Id.*

Commerce, therefore, recognized that promulgating 19 C.F.R. §351.401(i) would not only

conform its practice to the legal requirements of the URAA and the Tariff Act, but also to the

practical realities of commercial business:

> As a matter of commercial reality, the date on which the terms of a sale are first agreed is
> not necessarily the date on which those terms are finally established. In the Department's
> experience, price and quantity are often subject to continued negotiation between the
> buyer and the seller until a sale is invoiced. The existence of an enforceable sales
> agreement between the buyer and seller does not alter the fact that as a practical matter,
> customers frequently change their minds and sellers are responsive to those changes…
> Thus, the date on which the buyer and seller appear to agree on the terms of a sale is not
> necessarily the date on which the terms of the sale actually are established.

*Final Rule,* 62 Fed. Reg. at 27348-49.

The antidumping laws are not punitive in nature, but are designed to remedy the

inequities caused by unfair trade practices. Crucial to this remedial design is the need to

calculate antidumping duty margins on a fair and equitable basis. *See Koyo Seiko*, 36 F.3d at

1573. *See also NTN Bearing Corp. v. United States* 74 F.3d 1204, 1208 (Fed. Cir. 1995) ([I]t is

the duty of the ITA to determine dumping margins as "accurately as possible"), *quoting, Rhone*

*Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990). Fair and equitable

margins are calculated when the administering authorities are consistent in their procedural

application of the law. This consistency provides parties certainty in their expectations,

obligations, and potential liabilities. By adopting 19 C.F.R §351.401(i), Commerce sought to

provide a consistent methodology that provided parties with certainty as to which sales would be

subject to an antidumping investigation. Establishing invoice date as the presumptive date of

sale accomplished this goal, while at the same time allowing Commerce and parties the

flexibility to alter the date of sale where satisfactory evidence demonstrates that another date better reflects when the material elements of sale were finalized.

Commerce may not act arbitrarily, violate the antidumping laws or apply the laws in a manner contrary to congressional intent. *See Smith Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983), *Hussey Copper Ltd. v. United States*, 895 F. Supp. 311, 314 (Ct. Int'l Trade 1995). Through the URAA and the SAA, Congress expressed its intent that, for antidumping purposes, the date of sale be flexible so as to accurately reflect the true date on which the material elements of sale were established. Commerce's practice during the period of review and its subsequently promulgated regulation are consistent with this intent. By establishing a presumption in favor of invoice date as the date of sale Commerce has not foreclosed the possibility that another date could be chosen as the date of sale. Rather, consistent with the URAA and the SAA, parties are free to offer evidence that another date better reflects the true date on which the material elements of sale were established. Similarly, neither Commerce's practice nor 19 C.F.R. §351.401(i) impose upon parties seeking to establish a different date of sale an evidentiary standard that is inconsistent with Congress' intent. As in the past, parties must provide satisfactory and compelling evidence that another date is the more appropriate date of sale. This standard is directly in keeping with the URAA's requirements because, under the SAA's broad mandate and Commerce' methodology for determining the date of sale, interested parties bear the burden of providing evidence establishing the specific date of sale.

This Court finds that Commerce's practice during the period of review and the regulation that later codified this practice, 19 C.F.R. §351.401(i), are consistent with the requirements of the Tariff Act, as amended by the URAA. Because Commerce was guided by a valid practice and a

valid proposed regulation, this Court holds that Commerce's decision to use invoice date as the date of sale for subject merchandise entered during the period of review was properly in accordance with law.

B.       Commerce's Decisions are Supported by Substantial Evidence

        1.       Date of Sale:

In the absence of "satisfactory evidence" that the material terms of sale were established on some other date, Commerce will presumptively use invoice date as the date of sale. As such, Plaintiff bears the burden of providing Commerce with "satisfactory evidence" that the contract date was the appropriate date of sale. *See Final Rule*, 62 Fed. Reg. at 27349 ("If the Department is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of invoice, the Department will use that alternative date as the date of sale").

Neither Commerce nor this Court has defined what constitutes "satisfactory evidence" as it pertains to 19 C.F.R. §351.401(i). Its meaning, however, can be adequately determined through reference to standard lexicographic texts. *Black's Law Dictionary* (Fifth Edition) at 1205, appropriately defines the term as "such evidence as is sufficient to produce a belief that the thing is true… [s]uch evidence as, in respect to its amount or weight, is adequate or sufficient to justify the court or jury in adopting the conclusion in support of which it is adduced." Plaintiff, therefore, must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its factual conclusions as the only reasonable outcome. If, however, the record indicates that Commerce's decision to use the invoice date as the date of sale was reasonable and was supported by substantial evidence, Plaintiff's arguments must fail. For the reasons stated below, the Court finds that Plaintiff's arguments fail.

Commerce relied upon several pieces of record evidence in making its date of sale determination. It analyzed Saha Thai's questionnaire responses and sample sales documentation, interviewed several Saha Thai management personnel, and verified Saha Thai's reported information. From this evidence, Commerce drew five conclusions. First, Saha Thai customarily records invoice date as the date of sale in its financial records. *See Final Results,* 63 Fed. Reg. at 55587-88. Second, price is established at the date of contract, but quantity remains subject to change until the date of invoice. *See id.* Third, the sample sales documents provided by Saha Thai were reflective of its overall sales process and of the sales made during the period of review. *See id.* Fourth, according to Saha Thai's sales documents, quantity changes greater than those provided for in the sales contract frequently occurred. *See id.* Fifth, this frequency was sufficient to justify using the invoice date as the date of sale. *See id.*

As stated, Plaintiff contests these conclusions, arguing that the information and documents submitted by Saha Thai are not representative of Saha Thai's exports to the United States during the period of review. These documents are alleged to constitute only a single sale and, thus, an inadequate and non-representative sample of Saha Thai's sales. Moreover, Plaintiff argues that even if Commerce's calculations were correct, the small percentage of sales in which a quantity change greater than contractual tolerances occurred cannot, as a matter of law, support a finding that the material terms of sale were established on any date other than contract date.

Plaintiff, in essence, is asking this Court to do two things. First, it asks this Court to review the evidence relied upon by Commerce and to draw a contrary factual conclusion – *i.e.* that the sales documents contained evidence of a single sale as opposed to the representative sample found by Commerce. Second, based upon this contrary factual conclusion, Plaintiff asks

this Court to determine that the evidence is legally insufficient to support Commerce's determination. This Court is unable to do as Plaintiff asks.

Commerce has held that it "do[es] not treat an initial agreement as establishing the material terms of sale between the buyer and seller when changes to such an agreement are common, even if, for a particular sale, the terms did not actually change." *Stainless Steel Plates in Coils ("SSPC") from the Republic of Korea*, 64 Fed. Reg. 15444, 15449 (March 31, 1999). Rather, in situations where an initial agreement is reached but nevertheless remains subject to change, Commerce analyzes "whether changes are sufficiently common to allow [it] to conclude that initial agreements should not be considered to finally establish the material terms of sale." *Certain Welded Carbon Steel Pipes and Tubes from Thailand,* 64 Fed. Reg. 56759, 56768 (October 21, 1999), *quoting, Stainless Steel Plates in Coils ("SSPC") from the Republic of Korea*, 64 Fed. Reg. at 15449-50.

The record contains substantial evidence supporting the use of invoice date as the date of sale. The nature and frequency of the quantity changes discovered by Commerce indicate that the quantity term was not finally established on the date of contract.[9] When combined with the fact that Saha Thai regularly records invoice date as the date of sale in its financial records, it is apparent that Commerce's date of sale determination was supported by substantial evidence on the record.

Commerce's findings in this case were reasonable in light of the record evidence, its proposed regulation, and its prior practice. This Court, therefore, holds that Commerce's date of sale determination is supported by substantial evidence and is otherwise in accordance with

---

[9] Due to the proprietary nature of the sales information relied upon by Commerce in its determination, this Court declines to provide greater detail regarding its analysis.

law.

2.      Collapsing and Use of Facts Available:

Plaintiff's collapsing argument fits into a tri-partite rhythm in which the legal conclusion is the direct result of two mutually dependant factual assertions.   Plaintiff initially asserts that the information provided by Saha Thai was insufficient to allow Commerce to make a collapsing determination.  Then, relying on the presumed truth of this assertion, Plaintiff contends Commerce was required to look to the information that should have been provided by Thai Hong and Thai Tube to make its collapsing determination.  Because Thai Hong and Thai Tube failed to respond to Commerce's questionnaires, Plaintiff argues Commerce was required to fill in the gaps by applying adverse facts available against these companies.  Finally, Plaintiff concludes that if Commerce had applied adverse facts available against the Affiliated Companies, it would have issued an affirmative collapsing determination.  Though this argument is appealing, its conclusion is dependent upon the validity of each of its parts. If one of the parts is faulty, the underlying conclusion cannot stand.  For the reasons stated below, the Court finds the record is sufficient to support Commerce's collapsing determination, thus rendering the first part of Plaintiff's argument faulty.  Accordingly, this court finds that Plaintiff's conclusion cannot stand.

Commerce has a long history of collapsing affiliated parties – a practice that has been affirmed by this Court.  *See AK Steel Corp. v. United States*, 34 F. Supp. 2d 756, 765 (Ct. Int'l Trade 1998) (holding that although "[t]here is no explicit reference to collapsing in the [URAA's] legislative history… [this] history reflects Congressional awareness of collapsing").  This Court, though, has restricted the practice of collapsing to a limited number of "relatively unusual situations."  *Nihon Cement*, 17 CIT at 426.  As with the date of sale determination, Commerce's regulations did not specifically address collapsing prior to the enactment of the

URAA. Rather, Commerce determined the existence of a "relatively unusual situation" based upon its customs and prior practice. During the period of review, however, 19 C.F.R. §351.401(f) was proposed and had been cited by Commerce as consistent with its existing practice and policy. *See Gray Portland Cement and Clinker from Mexico*, 62 Fed. Reg. 47626, 47626 (Sept. 10, 1997); *Certain Pasta from Italy*, 61 Fed. Reg. 30326, 30352 (June 14, 1996). The standards set forth in this provision, therefore, provide guidance as to the appropriate methodology to be applied by Commerce in its collapsing determinations.

In determining whether to collapse two or more foreign manufacturers, Commerce must make three separate findings. First, Commerce must determine whether the companies are affiliated pursuant to 19 U.S.C. §1777(33)(f). Second, Commerce must find the existence of overlapping production facilities for similar or identical products that would not require retooling in order to restructure the companies' manufacturing priorities. *See* 19 C.F.R. §351.401(f)(1). Third, Commerce must find the affiliated companies are sufficiently intertwined as to permit the significant possibility of price or production manipulation. *See id*. To make the third finding, Commerce considers factors such as: (1) the level of common ownership; (2) the presence of interlocking boards of directors; and (3) the extent to which the companies are intertwined as evidenced by coordination of pricing decisions, shared employees, or transactions between the companies. *See* 19 C.F.R. §351.401(f)(2). *See also, Certain Pasta from Italy*, 61 Fed. Reg. at 30351.

Commerce conceded that Saha Thai, Thai Hong, and Thai Tube were affiliated because of common ownership and control by the Lamatipanont family. *See Final Results*, 63 Fed. Reg. at 55581 (finding that Saha Thai, Thai Hong, and Thai Tube satisfy the affiliation requirements set forth in 19 U.S.C. §1677(33)(f)). Similarly, Commerce determined that each of the Affiliated

Companies produced the same or similar products and, thus, possessed substantially similar production facilities. *See Id.* As noted, however, the evidence required to justify a collapsing determination "goes beyond that which is necessary to find common control" and, therefore, these two findings are necessary but not sufficient to warrant the collapsing of two or more companies. *Id.* at 55583. Commerce must additionally determine whether the affiliation between the companies poses a significant potential for price or production manipulation.

Commerce examined the information provided by Saha Thai, as well as the materials collected at verification, and found no evidence of commercial transactions between Saha Thai and either of the Affiliated Companies. Commerce found no evidence indicating that Saha Thai had any input in or access to production, pricing, or marketing decisions made by its two Affiliated Companies. *See* Memorandum from John Totaro to File, March 19, 1998, "*Sales Verification of Saha Thai Steel Pipe Co., Ltd.*", Defendant's Appendix at 9-12. Additionally, Commerce determined that the ownership and management connection between the Affiliated Companies was insufficient to result in the coordination of pricing decisions or the sharing of employees. In fact, Commerce found that: (1) the Lamatipanont family was merely one of several groups jointly and severally controlling Saha Thai; (2) while the Lamatipanont family held all of the board seats and key management positions at Thai Hong and Thai Tube, only one non-lineal relative held a seat on Saha Thai's board; and (3) there was little overlap of board and management positions among the three companies. *See Final Results*, 63 Fed. Reg. at 55583. As a result, Commerce determined that there was not a significant potential for price or production manipulation.

It is significant that Commerce found no evidence contradicting its findings and conclusions – *i.e.* no evidence indicating commercial transactions between the Affiliated

Companies or explicitly demonstrating price or production manipulation. Plaintiff, however, seeks to attach significance to the absence of explicit evidence demonstrating that the Affiliated Companies had not engaged in any commercial transactions during the period of review. They argue that truly independent companies would have produced such evidence and the absence of this evidence must, therefore indicate that the Affiliated Companies were engaged in activities that would warrant collapsing. To support its argument, Plaintiff point to the Federal Circuits decision in *Rhone Poulenc*, 899 F.2d at 1190, in which the Court found the lack of evidence demonstrating that dumping margins should be lowered to be significant. Specifically, the Federal Circuit stated that "it is a common sense inference" that if evidence existed indicating that the antidumping margin should be lowered "the importer… would have produced current information showing the margin to be less." *Id.*

Plaintiff's arguments are unpersuasive. It is substantially more plausible that a party could produce record evidence of sales figures and cost calculations that would rebut a prior dumping margin than it is for a company to produce evidence proving a negative – *i.e.* there were no business transactions or other forms of corporate interaction indicating significant potential for price or production manipulation. In this instance, to draw a negative inference from the absence of evidence that the companies were not involved in commercial transactions would be illogical and unfair.

The evidence relied upon by Commerce as the basis for its determination provides substantial support for its decision not to collapse the Affiliated Companies. This Court holds that Commerce's decision not to collapse the Affiliated Companies is supported by substantial evidence and is otherwise in accordance with law.

## CONCLUSION

For the reasons stated above, this Court holds that Commerce's final determination is supported by substantial evidence on the record and is otherwise in accordance with law.

Plaintiff's Motion for Judgement on Agency Record is DENIED.

_____
Gregory W. Carman,
Chief Judge

Dated: December 12, 2000
      New York, New York

**ERRATA**

Allied Tube & Conduit Corp. v. United States, Court No. 98-11-03135, Slip-Op. 00-160, dated December 12, 2000.

On p. 2, line 3, delete "Katherine A. Barski" and replace with "Kenneth S. Kessler."

On p. 2, line 6, replace the word "Bilezi" with the word "Bilzi."

December 14, 2000