**Slip Op. 04-18**

**United States Court of International Trade**

```
┌─────────────────────────────────────────┐
│ NEW WORLD PASTA COMPANY,                 │
│                                          │
│                Plaintiff,                │
│                                          │
│         v.                               │
│                                          │
│ UNITED STATES,                           │
│                                          │
│                Defendant,                │
│                                          │
│         and                              │
│                                          │
│ PASTIFICIO GAROFALO S.p.A. and           │
│ PASTIFICIO GUIDO FERRARA, S.r.L.,        │
│                                          │
│                Defendant-Intervenors.    │
└─────────────────────────────────────────┘
```

Before: Pogue, Judge

Court No. 03-00105

[Plaintiff's motion for judgment on the agency record denied; judgment entered for Defendant.]

Decided: March 1, 2004

Collier Shannon Scott, PLLC (Jennifer E. McCadney, Paul C. Rosenthal, David C. Smith, Jr.) for Plaintiff New World Pasta Company.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Ada Bosque, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Marisa Beth Goldstein, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant United States.

Hunton & Williams LLP (Richard P. Ferrin, Douglas J. Heffner, William Silverman) for Defendant-Intervenor Pastificio Garofalo S.p.A.

Law Offices of David L. Simon (David L. Simon) for Defendant-Intervenor Pastificio Guido Ferrara, S.r.L.

**OPINION**

**POGUE, Judge:**      In  an  administrative  appeal,  Plaintiff challenges  aspects  of  decisions  made  by  the  Department  of Commerce  ("Commerce")  concerning  two  of  the  investigated companies  in  Certain Pasta From Italy,  68 Fed. Reg.  6,882, 6,882-84  (Dep't Commerce Feb. 11, 2003)  (notice of final results of antidumping duty administrative review and determination not to revoke in part)  ("Final Determination").[1]  With regards to the first  company,  Pastificio  Garofalo  S.p.A.  ("Garofalo"), Plaintiff  challenges  Commerce's  decision  not  to  "collapse"

_____

[1]Commerce's Final Determination incorporates by reference the agency's Issues and Decision Memorandum. Final Determination, 68 Fed. Reg. at 6,883 (citing Dep't of Commerce Mem. from Bernard T. Carreau, Deputy Assistant Sec'y for Imp. Admin., to Faryar Shirzad, Assistant Secretary for Imp. Admin., Issues and Decisions for the Final Results of the Fifth Antidumping Duty Administrative Review, P.R. Doc. No. 134, Pl.'s Pub. Ex. 2. (Feb. 3, 2003) ("Decision Memorandum")).  The Decision Memorandum, in turn, incorporates by reference a prior memorandum. Decision Memorandum, P.R. Doc. No. 134, Pl.'s Pub. Ex. 2 at 9 (citing Dep't of Commerce Mem. from The Team, to Melissa G. Skinner, Director, Office of AD/CVD Enforcement VI, Whether to Collapse Pastificio Garofalo S.p.A. (Garofalo) and Pastificio Antonio Amato & C. S.p.A. (Pastificio Amato) in the Final Results, C.R. Doc. No. 59, Pl.'s Conf. Ex. 8 (February 3, 2003) ("Final Collapsing Memo")). The Final Collapsing Memo incorporates by reference still another memorandum.  Final Collapsing Memo, C.R. Doc. No. 59, Pl.'s Conf. Ex. 8 at 1-3 (citing Dep't of Commerce Mem. from The Team, to Melissa G. Skinner, Dir., Office of AD/CVD Enforcement VI, Whether to Collapse Garofalo S.p.A. (Garofalo) and Pastificio Antonio Amato & C. S.p.A. (Amato) in the Preliminary Results, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 4-5 (July 31, 2002) ("Preliminary Collapsing Memo")).

Garofalo with an affiliate,[2] and its decision not to use adverse facts available in making its determination. With regards to the second company, Pastificio Guido Ferrara, S.r.L. ("Ferrara"), Plaintiff challenges Commerce's decision to add a product-matching criterion for die-type in defining the "foreign like product"[3] for Ferrara, but not for other companies in the same review. This matter is before the Court on Plaintiff's motion for judgment upon the agency record. The Court has jurisdiction under 28 U.S.C. § 1581(c) (2000). For the reasons discussed below, the Court denies Plaintiff's motion and grants judgment for Defendant.

## BACKGROUND

To provide a context for the Court's review of Commerce's decisions, the Court first summarizes aspects of the agency's administrative proceedings. Insofar as they are at issue here, these proceedings began in August 2001, when the Department of Commerce published a notice of initiation of the fifth antidumping duty review for certain pasta from Italy, covering

---

[2]Commerce may, pursuant to 19 C.F.R. § 351.401(f) (2003), treat two affiliated companies as a single entity, i.e., "collapse" the two companies. For the full text of the regulation, see infra note 7.

[3]For the statutory definition of "foreign like product," see infra note 18.

the period from July 1, 2000 to June 30, 2001.  Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 66 Fed. Reg. 43,570, 43,571 (Dep't Commerce Aug. 20, 2001); see also Final Determination, 68 Fed. Reg. at 6,882.  Eight days after publishing the notice of initiation of the antidumping review, Commerce sent out initial questionnaires to the companies under review.  Def.'s Opp'n to Mot. J. Agency R. at 3 ("Def.'s Br.") (citations omitted).  Both Garofalo and Ferrara replied. The Court summarizes relevant parts of each response in turn.

In Garofalo's response, the company disclosed a family relationship between its majority shareholder and the majority shareholders of another pasta company, Antonio Amato & C. S.p.A. ("Amato"),[4] as well as certain intercompany transactions between the two.  Response of Pastificio Lucio Garofalo S.P.A. to Section A of the Department's Antidumping Questionnaire, C.R. Doc. No. 1, Pl.'s Conf. Ex. 10 at A7-A8 (Oct. 25, 2001)

---

[4]The Court notes that there is great inconsistency in the record as to Amato's proper or legal name.  However, on its own financial report, the company refers to itself as Antonio Amato & C. Molini e Pastifici.  See Amato's 2000 Financial Statement, Garofalo Verification Ex. 6(e), C.R. Doc. No. 38, Fiche 124 at Frame 45 (July 22, 2002).

("Garofalo's First Response").[5]   However, Garofalo claimed that

the two companies were not affiliates as defined by 19 U.S.C. §

1677(33),[6] and did not provide detailed information on Amato.

---

[5]Documents existing only in the confidential administrative record are referred to as "C.R. Doc. No." followed by their document number, and the fiche and frame at which they appear. Documents existing only in the public administrative record are referred to as "P.R. Doc. No." followed by their document number, and the fiche and frame at which they appear.  Documents in the parties' confidential exhibits to their briefs are referred to by "C.R. Doc. No." followed by the document number, "[Party Name]'s Conf. Ex." and the number of the exhibit. Documents in the parties' public exhibits to their briefs are referred to by "P.R. Doc. No." followed by the document number, "[Party Name]'s Pub. Ex." and the number of the exhibit.

[6]The text of 19 U.S.C. § 1677(33) is as follows:

(33) Affiliated persons

 The following persons shall be considered to be "affiliated" or "affiliated persons":
     (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
     (B) Any officer or director of an organization and such organization.
     (C) Partners.
     (D) Employer and employee.
     (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
     (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
     (G) Any person who controls any other person and such other person.

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

Garofalo's First Response, C.R. Doc. No. 1, Pl.'s Conf. Ex. 10 at A7-A9. Commerce issued a supplemental questionnaire to Garofalo, inquiring further about its relationship with Amato, and later conducted an on-site verification. Letter from James Terpstra, Program Manager, Office of AD/CVD Enforcement VI, Int'l Trade Admin., to William Silverman, Hunton & Williams, Section A, B & C Supplemental Questionnaire, C.R. Doc. No. 18, Garofalo's Conf. Ex. 8 at 2-3 (Apr. 19, 2002) ("Second Garofalo Questionnaire"); Dep't of Commerce Mem. from Geoffrey Craig et al., Trade Analysts, Office of AD/CVD Enforcement VI, to James Terpstra, Program Manager, Office of AD/CVD Enforcement VI, Verification of the Sales Response of Pastificio Lucio Garofalo S.p.A. (Garofalo), C.R. Doc. No. 40, Garofalo's Conf. Ex. 10 at 2 (July 22, 2002) ("Verification Report").

Information gathered from the supplemental questionnaire and the verification allowed Commerce to preliminarily decide that Garofalo and Amato were affiliated, but that they should not be collapsed. Certain Pasta from Italy, 67 Fed. Reg. 51,827, 51,828 (Dep't Commerce Aug. 9, 2002) (notice of preliminary results and partial rescission of antidumping duty administrative review and intent not to revoke in part)

---

19 U.S.C. § 1677(33)(2000) (emphasis supplied).

("Preliminary Results"); Preliminary Collapsing Memo, C.R. Doc.
No. 45, Pl.'s Conf. Ex. 7 at 4-5.  After Commerce issued the
Preliminary Results, Plaintiff challenged Commerce's decision
not to collapse Garofalo with its affiliate as well as
Commerce's failure to use adverse facts available against
Garofalo.  Petitioner's Case Brief Concerning Garofalo before
the Int'l Trade Admin. of the U.S. Dep't of Commerce, C.R. Doc.
No. 54, Pl.'s Conf. Ex. 12 at 1-12 (Sept. 19, 2002).  In its
final results, however, Commerce maintained that although
Garofalo was affiliated with Amato, Garofalo and Amato should
not be collapsed.  Decision Memorandum, P.R. Doc. No. 134, Pl.'s
Pub. Ex. 2 at 9-11.

Ferrara, in its response to Commerce's initial
questionnaire, requested that Commerce add a new product-
matching criterion, reflecting the type of die used to extrude
the pasta, in defining "foreign like product" for purposes of
the antidumping review.  Letter from David L. Simon and Ayla
Önder, Law Offices of David L. Simon, to Sec'y of Commerce,
Pasta from Italy: Pastificio Guido Ferrara s.r.l. Response to
Sections A-C of the Questionnaire, C.R. Doc. No. 3, Fiche 58 at
Frames 26-27 (Oct. 25, 2001) ("Ferrara's First Response").
Commerce subsequently sent a supplemental questionnaire to
Ferrara asking for a demonstration that the added criterion

would be valid.  See Letter from David L. Simon and Ayla Önder, Law Offices of David L. Simon, to Sec'y of Commerce, Pasta from Italy; Pastificio Guido Ferrara s.r.l. Response to 2nd Supplemental Questionnaire, C.R. Doc. No. 35, Fiche 94 at Frame 7 (July 16, 2002) ("Ferrara's Second Response").  Ferrara submitted a response, providing the verification report and the production cost verification documents from the previous antidumping review of Certain Pasta from Italy, wherein Commerce had added such a criterion for Ferrara, as well as certain new exhibits.  Id. at Frames 7-11; see also Dep't of Commerce Mem. from Frank Thomson and Mark Young, Case Analysts, Office of AD/CVD Enforcement VI, to James Terpstra, Program Manager, Office of AD/CVD Enforcement VI, Verification of the Sales Response of Pastificio Guido Ferrara s.r.l. ("Ferrara") in the 99/00 Antidumping Review of the Antidumping Duty Order of Certain Pasta from Italy, C.R. Doc. No. 35, Ferrara's Conf. Ex. 2 (July 16, 2002) ("Ferrara Verification Report"); Verification Ex. 20: Production Costs, C.R. Doc. No. 35, Ferrara's Conf. Ex. 3 (July 16, 2002); Production Control System Recipe Screenshots, C.R. Doc. No. 35, Ferrara's Conf. Ex. 4 (July 16, 2002); Extracts from HM Database & Package Labelling, C.R. Doc. No. 35, Ferrara's Conf. Ex. 5 (July 16, 2002).

Plaintiff challenged the addition of a fifth criterion in a case brief, but in the final results, Commerce maintained that the die-type product criterion was valid in relation to Ferrara, but that it should not be applied to the other respondents. Plaintiff's Case Brief Concerning Pastificio Guido Ferrara, s.r.l before the Int'l Trade Admin. of the U.S. Dep't of Commerce,  C.R. Doc. No. 52, Fiche 107 at Frames 39-43 (Sept. 19, 2002); see Decision Memorandum, P.R. Doc. No. 134, Pl.'s Pub. Ex. 2 at 23.

Plaintiff consequently filed for relief in this Court.

**STANDARD OF REVIEW**

This Court reviews the actions of the government in antidumping duty proceedings to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

**DISCUSSION**

Four issues are before the Court, two relating to Commerce's treatment of Garofalo, and two relating to Commerce's treatment of Ferrara.

With respect to Garofalo, Plaintiff argues that Commerce acted without support of law or substantial evidence in refusing to collapse Garofalo with its affiliate, Amato, and in refusing to apply adverse facts available to Garofalo in making its collapsing determination.

With respect to Ferrara, Plaintiff argues that Commerce acted without support of law or substantial evidence in adding a product-matching criterion for die-type to the definition of "foreign like product" for Ferrara, and in not adding the product-matching criterion for die-type to the definition of "foreign like product" for other companies in the same review.

The Court will discuss the challenges to Garofalo and Ferrara in turn.

A. Challenges to the Determination Regarding Garofalo

Plaintiff first argues that Commerce's decision not to collapse Garofalo with its affiliate, Amato, was unsupported by law or substantial evidence. Principal Br. of Pl. New World Pasta Company at 7 ("Pl.'s Br."). Second, Plaintiff argues that Commerce's decision not to apply adverse facts available against Garofalo in making the collapsing decision was unsupported by law or substantial evidence. See Pl.'s Br. at 10-11. The Court discusses each argument in turn.

Commerce's decision not to collapse Garofalo and Amato was based on Commerce's application of its own regulations regarding "collapsing factors" and its interpretation of the evidence presented.

Pursuant to 19 C.F.R. § 351.401(f)(1),[7] Commerce will collapse two producers where they are affiliated, and "where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and [Commerce] concludes that there is a significant

---

[7]The text of 19 C.F.R. § 351.401(f) is as follows:

(f) Treatment of affiliated producers in antidumping proceedings—(1) In general.  In an antidumping proceeding under this part, [Commerce] will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and [Commerce] concludes that there is a significant potential for the manipulation of price or production.
    (2) Significant potential for manipulation.  In identifying a significant potential for the manipulation of price or production, the factors [Commerce] may consider include:
    (i) The level of common ownership;
    (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
    (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f) (emphasis supplied).

potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1). Commerce found the first two of the three collapsing factors satisfied here: affiliation and similar production facilities not requiring substantial retooling in order to change manufacturing priorities.

With regards to the first factor, affiliation, under 19 U.S.C. § 1677(33)(A), Commerce will consider persons (including corporations under 19 C.F.R. § 351.102(b)) affiliated where there is a family relationship between them. Under 19 U.S.C. § 1677(33)(F), Commerce will consider persons affiliated when they are under common control. Because Amato's major shareholders include a sister and a sister-in-law of Garofalo's majority shareholder, Commerce found that the two companies were affiliated under 19 U.S.C. § 1677(33)(A). Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 4. Commerce also found that a group of related individuals exercised common control over both Garofalo and Amato. Id. Hence, Commerce found the two companies affiliated under both 19 U.S.C. § 1677(33)(A) and 19 U.S.C. § 1677(33)(F). Id. Plaintiff does not contest this finding.

As to the second factor, similar production lines, Commerce also found that Garofalo and Amato, as pasta companies, had similar production facilities that might not require substantial

retooling in order to restructure manufacturing priorities. Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 4. Plaintiff does not contest this finding.

Plaintiff does, however, challenge Commerce's failure to find that the third collapsing factor, "significant potential for the manipulation of pricing or production," was satisfied. See Pl.'s Br. at 12; 19 C.F.R. § 351.401(f)(1). This third factor itself has three sub-factors. See 19 C.F.R. § 351.401(f)(2). These are (1) the level of common ownership, (2) the extent to which managerial employees or directors of one firm also sit on the board of the other firm, and (3) whether operations are intertwined. Id.

Commerce found that none of the sub-factors were met. Decision Memorandum, P.R. Doc. No. 134, Pl.'s Pub. Ex. 2 at 10-11. Plaintiff challenges the determinations as to all three sub-factors.

In regards to the first sub-factor, common ownership, Plaintiff contends that Commerce originally found that this factor was met, and then arbitrarily retreated from the finding. Pl.'s Br. at 13-14. In the Preliminary Collapsing Memo, Commerce does state that the first sub-factor of 19 C.F.R. § 351.401(f)(2), common ownership, is met because of the common control exerted over both Garofalo and Amato by the group of

related individuals. See Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 4. However, in the Final Collapsing Memo and the Decision Memorandum, Commerce, while discussing the effect of a sale of stock in Amato by Garofalo's major shareholder, which occurred before the period of review ("POR"), states that the factor of common ownership is not, in fact, satisfied. Final Collapsing Memo, C.R. Doc. No. 59, Pl.'s Conf. Ex. 8 at 3-4; Decision Memorandum, P.R. Doc. No. 134, Pl.'s Pub. Ex. 2 at 10-11 ("[A]lthough petitioners' new argument implicates the first two criteria of 19 CFR 341.401(f)(2) [sic], based on the record facts and our interpretation of those facts, we have determined that neither criterion has been satisfied.").

While Commerce's two statements could appear inconsistent, a review of the record leads the Court to conclude that any inconsistency does not render Commerce's decision legally flawed. Under the collapsing regulation, 19 C.F.R. § 351.401(f)(1), "the evidence required to justify a collapsing determination 'goes beyond that which is necessary to find common control.'" Allied Tube and Conduit Corp. v. United States, 24 CIT __, __, 127 F. Supp. 2d 207, 222 (2000) (quoting Certain Welded Carbon Steel Pipes and Tubes from Thailand, 63 Fed. Reg. 55,578, 55,583 (Dep't Commerce Oct. 16, 1998) (final results of antidumping duty administrative review)). While

Commerce did not explain why it chose to regard the factor as unsatisfied in the final results, it did explain in the Preliminary Collapsing Memo that even were the factor of common ownership satisfied, the two parties should not be collapsed because common ownership would be based entirely on the finding of affiliation by common control under 19 U.S.C. § 1677(33)(F). See Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 4. Therefore, even were the sub-factor of common ownership satisfied, it alone could not justify collapse; Commerce would still need to review the other two sub-factors. Commerce did so, and found them unsatisfied.

In regards to the second sub-factor, the extent to which managerial employees or directors of one firm also sit on the board of the other firm, Commerce explained that during the POR, no members of Garofalo's board sat on Amato's board, and there were no shareholders in common. Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 5; see also Verification Report, C.R. Doc. No. 40, Garofalo's Conf. Ex. 10 at 5-6, 10. At verification, Commerce examined the financial records of both Garofalo and Amato, Garofalo's *Libro Soci* (which by Italian Law, must list shareholders), and the tax returns of Garofalo's shareholders. Verification Report, C.R. Doc. No. 40, Garofalo's Conf. Ex. 10 at 6-7; Garofalo's Financial Statements, Garofalo

Verification Ex. 3, C.R. Doc. No. 38, Fiche 123 at Frames 9-12 (July 22, 2002); Amato's 2000 Financial Statement, Garofalo Verification Ex. 6(e), C.R. Doc. No. 38, Fiche 124 at Frames 45-50 (July 22, 2002); Pages from Garofalo's Shareholder's Book, Garofalo Verification Ex. 4(c), C.R. Doc. No. 38, Fiche 123 at Frame 90-92 (July 22, 2002); Tax Returns, Garofalo Verification Ex. 16, C.R. Doc. No. 38, Fiche 126 at Frame 14-56 (July 22, 2002). Moreover, Commerce examined a contract of sale whereby Garofalo's majority shareholder had sold a minority interest in Amato previous to the POR, and found that all legal interest in Amato had passed from the majority shareholder prior to the POR. See Verification Report, Garofalo's Conf. Ex. 10 at 7; Final Collapsing Memo, C.R. Doc. No. 59, Pl.'s Conf. Ex. 8 at 3-4.

In regards to the third sub-factor, whether operations are intertwined, Commerce verified the small level of intercompany transactions to which Garofalo had admitted in its questionnaire responses. Verification Report, C.R. Doc. No. 40, Garofalo's Conf. Ex. 10 at 14-15; Completeness Test of Purchased Semolina Using Bolla Book, Garofalo Verification Ex. 13, C.R. Doc. No. 38, Fiche 125 at Frames 65-66 (July 22, 2002); Completeness Test of Purchased Pasta Using Bolla Book, Garofalo Verification Ex. 19, C.R. Doc. No. 38, Fiche 128 at Frame 1 (July 22, 2002). These involved the purchase by Garofalo of a very small amount

of finished pasta from Amato for resale during the POR, and the purchase of some semolina from Amato during the same period. Garofalo's First Response, C.R. Doc. Nos. 1-2, Pl.'s Conf. Ex. 10 at A8-A9; Letter from William A. Silverman et al., Hunton & Williams LLP, to Sec'y of Commerce, Certain Pasta From Italy, C.R. Doc. No. 11, Garofalo's Conf. Ex. 7 at 8 (Mar. 26, 2002) ("Mar. 26 Letter").  Garofalo had described these transactions as being conducted at arm's length.  Garofalo's First Response, C.R. Doc. Nos. 1-2, Pl.'s Conf. Ex. 10 at A7-A9; Letter from William A. Silverman et al., Hunton & Williams LLP, to Sec'y of Commerce, Certain Pasta From Italy, C.R. Doc. No. 22, Fiche 82 at Frames 17-18 (May 17, 2002) ("Garofalo's Second Response"). Garofalo provided to Commerce, previous to verification, a list of all semolina purchases made during fiscal year 2000.  Mar. 26 Letter, C.R. Doc. No. 11, Garofalo's Conf. Ex. 7 at App. 1.  At verification, Commerce examined Garofalo's selected records of purchases of semolina and pasta during 2001, up until the end of the POR, compared amounts and prices, and concluded that the semolina transactions were made on the same basis as those being conducted with other, non-affiliated semolina producers, and that the pasta-transactions were both small and within standard business practices.  See Preliminary Collapsing Memo, C.R. Doc No. 45, Pl.'s Conf. Ex. 7 at 5; Verification Report, C.R. Doc.

No. 40, Garofalo's Conf. Ex. 10 at 14-15. Finally, Commerce did not find that either company was sharing sales data, customer information, or had any links other than the intercompany purchases of pasta and semolina. Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 5.

Plaintiff argues nonetheless that Commerce's decisions as to the three sub-factors were unsupported by law or substantial evidence. As to the first sub-factor, Plaintiff argues that Commerce's unexplained decision to reverse its finding that common ownership was satisfied is arbitrary and unsupported by substantial evidence. See Pl.'s Br. at 13-14.[8] While the

---

[8]The Court notes that Plaintiff's arguments on this point are opaque, as Plaintiff mischaracterizes the language of the Preliminary Collapsing Memo. On page thirteen of its principal brief, Plaintiff states that: "[i]n the Preliminary Results, Commerce determined that the first criterion, the level of common ownership, was sufficient to find that the two companies should be collapsed because the agency found Garofalo and Amato to be under 'common ownership.'" Pl.'s Br. at 13 (referring to the Preliminary Collapsing Memo when it mentions "the Preliminary Results"). Contrary to Plaintiff's claim, while, in the Preliminary Collapsing Memo, Commerce found that the two companies were affiliated because of the operation of both 19 U.S.C. § 1677(33)(A) and 19 U.S.C. § 1677(33)(F) (affiliation by common control), and that the sub-factor of common ownership was therefore satisfied, it did not decide that this sub-factor was sufficient for a finding of collapse. Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 4-5. This mischaracterization made it difficult to discern the true nature of Plaintiff's argument: that there had been an unexplained change in Commerce's position on the issue of whether the common ownership sub-factor was satisfied, not in whether collapse was justified.

turnaround could appear troubling, as noted above, even were the factor found to be satisfied, it would not be possible to collapse Garofalo and Amato based on that sub-factor alone. See Allied Tube & Conduit Corp., 24 CIT at __, 127 F. Supp. 2d at 222. If Commerce was justified in finding that the other two sub-factors were unsatisfied, then any argument on this sub-factor becomes moot, as its resolution one way or the other could not affect the collapsing decision.

It is a "substantial evidence" argument that predominates in Plaintiff's arguments as to the second and third sub-factors. On the issue of the second sub-factor, the extent to which managerial employees or directors of one firm also sit on the board of the other firm, Plaintiff advances the argument that Commerce is required by law to look to the future in evaluating the potential for manipulation. See Reply Br. of Pl. New World Pasta Company at 7 ("Pl.'s Reply Br."). Therefore, Plaintiff argues, Commerce's determination was unsupported by substantial evidence where Commerce relied on the state of affairs during the POR in finding a lack of significant potential for manipulation. Id. Plaintiff also claims that Commerce did not properly take into account Garofalo's majority shareholder's ability to "require" the purchase of the majority shareholder's stock in Amato prior to the period of review. Pl.'s Br. at 17.

Plaintiff argues that this should weigh in favor of a finding of significant potential to manipulate. See id. Moreover, Plaintiff claims that the small, family-owned structure of Garofalo and Amato, supports a finding of significant potential for manipulation. See Pl.'s Br. at 16.

It is true that Commerce "will consider future manipulation" in evaluating the potential for manipulation. Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,346 (Dep't Commerce May 19, 1997) (final rule). However, during the POR there were in fact no board members or managerial employees in common at the two companies, nor was there any interlocking of managerial shareholders.[9] Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 5; Garofalo's Second Response, C.R. Doc. No. 22, Fiche 82 at Frame 16; Verification Report, C.R. Doc. No. 40, Garofalo's Conf. Ex. 10 at 5-8; cf. Organizational Chart, Garofalo Verification Ex. 2,

---

[9]Plaintiff argues that Commerce's decision does not rest on substantial evidence because Commerce never learned the names of Amato's directors nor the names of upper management. See Pl.'s Reply Br. at 8. However, Commerce obtained the names of Amato's directors and management in the course of its verification, when it procured a copy of Amato's publicly available financial report, which lists shareholders, directors, and identifies upper management. Amato's 2000 Financial Statement, Garofalo Verification Ex. 6(e), C.R. Doc. No. 38, Fiche 124 at Frame 67 (July 22, 2002). Cross-checking of this list against Garofalo's organizational chart reveals no overlap. Organizational Chart, Garofalo Verification Ex. 2, C.R. Doc. No. 38, Fiche 123 at Frame 8 (July 22, 2002).

C.R. Doc. No. 38, Fiche 123 at Frame 8 (July 22, 2002), with Amato's 2000 Financial Statement, Garofalo Verification Ex. 6(e), C.R. Doc. No. 38, Fiche 124 at Frame 67 (July 22, 2002). While it is reasonable for Plaintiff to argue that common control shows a possibility of manipulation, it is just as reasonable for Commerce to conclude that the lack of board entwinement during the POR provides a reasonable basis for a finding of no likelihood of future manipulation, and Commerce's reasonable interpretation of the evidence will be upheld under the standard of review applicable here. As for Garofalo's majority shareholder's contract to sell the shareholder's interest in Amato, Commerce examined the contract and found that, despite certain monies still being owed during the POR, the material terms of sale were set before the POR. See Verification Report, C.R. Doc. No. 40, Garofalo's Conf. Ex. 10 at 7; Sales Contract, Garofalo Verification Ex. 6(d), C.R. Doc. No. 38, Fiche 124 at Frames 35-44 (July 22, 2002). Commerce has explained that in antidumping reviews, its regulations specify that sales of "foreign like product" or subject merchandise are regarded as completed as of the date the material terms are set. See 19 C.F.R. § 351.401(i); Final Collapsing Memo, C.R. Doc. No. 59, Pl.'s Conf. Ex. 8 at 3. While neither "foreign like product" nor subject merchandise was the subject of this sale,

Commerce indicated that the date material terms are set should control. Final Collapsing Memo, C.R. Doc. No. 59, Pl.'s Conf. Ex. 8 at 3. While Commerce might have chosen to deal otherwise with such contracts, its choice is reasonable, and will be upheld.

The family-owned nature of the two businesses is yet another fact that could be weighed differently by reasonable people. The family connections and relative simplicity of the businesses could facilitate manipulation, as Plaintiff contends, or could be completely irrelevant to manipulation, as Commerce appears to have found. The mere fact that two inconsistent conclusions can be drawn from a piece of evidence does not render an agency's decision unsupported by substantial evidence. Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citation omitted). Therefore, despite the small, family-owned nature of the two companies, record evidence indicating that there was no overlap of directors, major shareholders, or managerial employees during the POR supports Commerce's finding that the second factor of the significant potential for manipulation analysis is not met.

In regards to the third sub-factor, whether operations are intertwined, Plaintiff asserts that Commerce's decision is unsupported by substantial evidence because the operations of

the two companies are entwined in a way that makes for a significant potential for manipulation. See Pl.'s Br. at 18-20. The regulation describing entwinement of operations highlights such practices as sharing of sales information, sharing of facilities, and involvement in production and pricing transactions, none of which are present on this record. 19 C.F.R. § 351.401(f)(2)(iii).[10]  The regulation also describes "significant transactions" between affiliated producers as cause to find the third sub-factor satisfied. Id.  However, Commerce found the transactions here not to be significant, as the transactions did not amount to a majority of Garofalo's purchases of either semolina or pasta, and moreover, appeared customary for the Italian Pasta industry.[11]  See Preliminary

---

[10]For the text of the regulation, see supra note 7.

[11]Commerce states in its Preliminary Collapsing Memo that the types of transactions that were conducted between Garofalo and Amato are common in the Italian pasta industry. Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 4-5. Commerce repeats this statement in its Decision Memorandum and in its brief. Decision Memorandum, P.R. Doc. No. 134, Pl.'s Pub. Ex. 2 at 10; Def.'s Br. at 17. Commerce does not cite to the evidence that supports this contention. However, during Verification, Garofalo personnel explained that buying pasta for resale from other pastificios allowed Garofalo to round out its product line without reconfiguring its machinery, and that the practice was common. See Verification Report, C.R. Doc. No. 40, Pl.'s Conf. Ex. 11 at 14. This explains the practice as regards purchases of pasta, but not purchases of semolina. However, with regard to semolina, Commerce found that the purchases of semolina were conducted at market rates, and that during the

Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 5;

Verification Report, C.R. Doc. No. 40, Garofalo's Conf. Ex. 10

at 14-15; Completeness Test of Purchased Semolina Using Bolla

Book, Garofalo Verification Ex. 13, C.R. Doc. No. 38, Fiche 125

at Frame 65 (July 22, 2002); Garofalo Verification Ex. 19,

Completeness Test of Purchased Pasta Using Bolla Book, C.R. Doc.

No. 38, Fiche 128 at Frame 1 (July 22, 2002).[12]

---

POR, the majority of Garofalo's semolina purchases were from
providers other than Amato.  Id.; see Completeness Test of
Purchased Semolina Using Bolla Book, Garofalo Verification Ex.
13, C.R. Doc. No. 38, Fiche 125 at Frame 65 (July 22, 2002);
Mar. 26 Letter, C.R. Doc. No. 11, Garofalo's Conf. Ex. 7 at App.
1.

[12]Plaintiff also argues that Commerce's decision regarding
the third sub-factor is unsupported by substantial evidence in
that Commerce, in reviewing Garofalo's purchases of semolina and
pasta, only had information on purchases from the first half of
the POR.  Pl.'s Reply Br. at 11.  This claim is unsupported by
the record.  Garofalo provided to Commerce a list of fiscal year
2000 semolina purchases. See Mar. 26 Letter, C.R. Doc. No. 11,
Garofalo's Conf. Ex. 7 at App. 1.  Commerce, during
verification, looked at selected purchases from fiscal year 2001
to verify that purchases were at arms length and that the
percentage of purchases from Amato remained more or less
constant.  Completeness Test of Purchased Semolina Using Bolla
Book, Garofalo Verification Ex. 13, C.R. Doc. No. 38, Fiche 125
at Frame 65 (July 22, 2002).  Garofalo informed Commerce that
purchases of pasta from Amato in fiscal year 2000 for resale
accounted for only a small percentage of total pasta sales.
Mar. 26 Letter, C.R. Doc. No. 11, Garofalo's Conf. Ex. 7 at 8.
In its verification report, Commerce noted the amount that
Garofalo claimed, and appeared to find no discrepancies.
Verification Report, C.R. Doc. No. 40, Garofalo's Conf. Ex. 10
at 14-15.

Therefore, Commerce's decision not to collapse Garofalo and Amato was supported by substantial evidence and in accordance with law. Commerce acted reasonably in deciding only to consider events occurring during the POR in evaluating the collapsing factors, and while it could have reasonably made different inferences from the facts, the ones it did make were reasonable and supported by the record.

Having found that Commerce's decision not to collapse Garofalo and Amato as a single entity was in accordance with law and supported by substantial evidence, the Court now turns to the second issue involving Garofalo: whether, in making its collapsing determination, Commerce's decision not to apply facts available or adverse facts available[13] to Garofalo was unsupported by law and substantial evidence.

---

[13]Plaintiff's brief argues that Commerce acted improperly in not using adverse facts available against Garofalo, on the basis of what Plaintiff perceives of as significant omissions in Garofalo's responses and cooperation. See Pl.'s Br. at 10. Plaintiff does not, however, argue for the use of facts available, a prerequisite to adverse facts available under 19 U.S.C. § 1677e. Presumably, this is because the use of facts available, without adverse inferences, would have produced the same result as obtained in the administrative review: a finding of affiliation, but not of collapse. The Court's discussion of the issue, however, deals with both the question of whether Commerce properly declined to use adverse facts available and whether it properly declined to use facts available. The text of 19 U.S.C. § 1677e, which describes the use of both facts available and adverse facts available, is reproduced here:

---

§ 1677e.   Determinations on the basis of the facts available

(a) In general

  If--
   (1) necessary information is not available on the record, or
   (2) an interested party or any other person--
      (A) withholds information that has been requested by the
  administering authority or the Commission under this
  subtitle,
      (B) fails to provide such information by the deadlines for
  submission of the information or in the form and manner
  requested, subject to subsections (c)(1) and (e) of section
  1677m of this title,
      (C) significantly impedes a proceeding under this
  subtitle, or
      (D) provides such information but the information cannot
  be verified as provided in section 1677m(i) of this title,

the administering authority and the Commission shall, subject
to section 1677m(d) of this title, use the facts otherwise
available in reaching the applicable determination under this
subtitle.

(b) Adverse inferences

  If the administering authority or the Commission (as the case
may be) finds that an interested party has failed to cooperate
by not acting to the best of its ability to comply with a
request for information from the administering authority or the
Commission, the administering authority or the Commission (as
the case may be), in reaching the applicable determination under
this subtitle, may use an inference that is adverse to the
interests of that party in selecting from among the facts
otherwise available.  Such adverse inference may include
reliance on information derived from--
   (1) the petition,
   (2) a final determination in the investigation under this
  subtitle,
   (3) any previous review under section 1675 of this title or
  determination under section 1675b of this title, or
   (4) any other information placed on the record.

19 U.S.C. § 1677e(a)-(b) (2000) (emphasis supplied).

Application of adverse facts available is governed by 19 U.S.C. § 1677e(b), which states that if Commerce finds that an interested party has not acted to the best of its ability to comply with a request for information, Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  While 19 U.S.C. § 1677e(b) allows Commerce to apply adverse inferences where it feels that a party "has failed to cooperate by acting to the best of its ability to comply with a request for information," use of adverse inferences is discretionary.  Moreover, such inferences cannot be applied until and unless 19 U.S.C. § 1677e(a) is operative.  19 U.S.C. § 1677e(a).  19 U.S.C. § 1677e(a) states, among other things, that Commerce "shall use the facts otherwise available" where a party withholds information or fails to submit it in the proper manner.  Id.

Thus, while Plaintiff's arguments focus on the application of adverse inferences, Plaintiff's argument might be better understood as an argument that "facts otherwise available" should have been applied against Garofalo.[14]  In addition, 19

---

[14]The mandatory language of the facts available provision -- "shall"-- appears to remove from Commerce any discretion about whether to use facts available when there is a withholding of information or failure to submit in the proper form, and if read

U.S.C. § 1677e(a) is subject to the dictates of 19 U.S.C. § 1677m(d).  That provision requires Commerce, if it finds a submission from a party to be deficient, to inform the party of the deficiencies and to allow for remedy or explanation.  19 U.S.C. § 1677m(d).[15]

---

strictly, could mandate the use of facts available wherever there is a slight discrepancy between question and answer. However, this Court has held that Commerce may not use facts available at least until Commerce issues a supplemental questionnaire.  See Nippon Steel v. United States, 25 CIT __, __, 146 F. Supp. 2d 835, 837 (2001)(citing NTN Bearing Corp. v. United States, 25 CIT __, 132 F. Supp. 2d 1102 (2001); SKF USA Inc. v. United States, 24 CIT __, __ 116 F. Supp. 2d 1257, 1268 (2000)) (rev'd on other grounds).  This result obtains because of the dictates of 19 U.S.C. § 1677m(d) (reproduced below, note 15), which require that Commerce give notice of a deficiency and opportunity to remedy the deficiency before applying facts available.

[15]Title 19 U.S.C. § 1677m(d) is as follows:

(d) Deficient submissions

If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either--
    (1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or
    (2) such response is not submitted within the applicable time limits,

Assuming that Commerce's issuance of a supplemental questionnaire to Garofalo was inherently a finding that Garofalo's first questionnaire response failed to comply with Commerce's request for information,[16] under 19 U.S.C. § 1677m(d), Garofalo's supplemental questionnaire response would merit use of facts otherwise available only if Commerce found that it, too, was deficient.  19 U.S.C. § 1677m(d).  Commerce does not appear to have found Garofalo's second questionnaire response unsatisfactory, as it did not attempt to apply facts available or adverse facts available in its review.  Commerce's decision not to apply facts otherwise available is therefore in accordance with law.

However, Plaintiff argues that Commerce's refusal to use adverse facts available against Garofalo was unsupported by substantial evidence.  See Pl.'s Br. at 10.  Plaintiff argues that because Commerce eventually found that Garofalo and Amato were affiliated, Garofalo's failure to provide "a single

---

then the administering authority or the Commission as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.

19 U.S.C. § 1677m(d) (emphasis supplied).

[16]See, e.g., China Steel Corp. v. United States, 27 CIT __, __, 264 F. Supp. 2d 1339, 1356 (2003); Reiner Brach GmbH & Co. KG v. United States, 26 CIT __, __, 206 F. Supp. 2d 1323, 1332 (2002); Bergerac, N.C. v. United States, 24 CIT __, __, 102 F. Supp. 2d 497, 504 (2000).

response that includes information, including financial statements, for all affiliates" in its questionnaire responses means that Garofalo failed to respond to the questionnaires adequately and that its submissions are therefore deficient. See id.[17] Given the Court's discussion of 19 U.S.C. § 1677m(d) above, this argument becomes a question of whether Commerce had substantial support for its finding that Garofalo's first and second responses, taken together, constituted an adequate response to Commerce's questionnaires, such that Commerce could reasonably decide not to apply facts available or adverse facts available.

In its initial questionnaire, Commerce required that Garofalo provide an organization chart and description of its legal structure, including any affiliated persons or companies. U.S. Dep't of Commerce, Imp. Admin. Office of Antidumping and Countervailing Duty Enforcement, Request for Information, Italy, Certain Pasta, P.R. Doc. No. 19, Pl.'s Pub. Ex. 9 at A4 (Aug. 28, 2001) ("Initial Questionnaire"). Garofalo's response

---

[17]In its case brief before the agency, Plaintiff also argued that Garofalo's failure to report the sale of Amato stock by Garofalo's major shareholder before the POR rendered Garofalo's responses deficient. See Petitioner's Case Brief Concerning Garofalo before the Int'l Trade Admin. of the U.S. Dep't of Commerce, C.R. Doc. No. 54, Pl.'s Conf. Ex. 12 at 3-7 (Sept. 19, 2002). However, Plaintiff does not appear to pursue this argument in its briefs before the Court. See Pl.'s Br; Pl.'s Reply Br.

admitted that relatives of its majority shareholder owned another pasta company, Amato. Garofalo's First Response, C.R. Doc. No. 1, Pl.'s Conf. Ex. 10 at A7. The response also disclosed that the two companies engaged in intercompany transactions; specifically, Garofalo had purchased from Amato during the POR a quantity of semolina and a small amount of finished pasta. Id. at A8-A9. Garofalo contended in its response, however, that Garofalo and Amato were not affiliates. Id. at A7-A9.

In its supplemental questionnaire, Commerce asked three questions relating to Garofalo's relationship with Amato. See Garofalo's Second Response, C.R. Doc. No. 22, Fiche 82 at Frames 16-17. Commerce first asked Garofalo to state whether Garofalo owned stock in Amato, provided loan or credit guarantees to Amato, or shared customer lists with Amato. Garofalo replied in the negative. See Garofalo's Second Response, C.R. Doc. No. 22, Fiche 82 at Frame 16. Next, Commerce requested the names of Amato's shareholders, and asked Garofalo to specify if there were any other companies that might be affiliated with both Garofalo and Amato, and with whom Garofalo dealt. Id. Garofalo revealed the names of Amato's shareholders, as garnered from publicly available sources, and stated that it was not affiliated with any affiliates of Amato, and did not have any

dealings with affiliates of Amato. See Garofalo's Second Response, C.R. Doc. No. 22, Fiche 82 at Frames 16-17. Third, Commerce asked Garofalo to describe the terms and conditions of intercompany transactions between Garofalo and Amato, and to alert Commerce to any such transactions not described in Garofalo's first questionnaire response. See Garofalo's Second Response, C.R. Doc. No. 22, Fiche 82 at Frame 17. Garofalo described the transactions it had already revealed in its first response, and affirmed that there were no others. See Garofalo's Second Response, C.R. Doc. No. 22, Fiche 82 at Frames 17-18.

At verification Commerce discovered that Garofalo's major shareholder had previously owned a minority interest in Amato, but found that the interest had been divested prior to the POR, and that it was therefore unnecessary for Garofalo to have reported on it. See Preliminary Collapsing Memo, C.R. Doc. No. 45, Pl.'s Conf. Ex. 7 at 3-4; see also Verification Report, C.R. Doc. No. 40, Garofalo's Conf. Ex. 10 at 6-7. No other discrepancies with Garofalo's responses were noted. See Verification Report, C.R. Doc. No. 40, Garofalo's Conf. Ex. 10.

Based on the three follow-up questions of the supplemental questionnaire, Commerce appears to have found the original response deficient in only a few respects. Garofalo was

responsive to the questions in the supplemental questionnaire, and its responses were later successfully verified. Accordingly, the Court concludes that Commerce's decision not to apply adverse facts available or facts available in making its affiliation and collapsing decisions was supported by substantial evidence.

B.  Challenges to the Determination Regarding Ferrara

The remaining two issues in the case deal with Plaintiff's challenges to Commerce's treatment of Ferrara.  Plaintiff first argues that Commerce acted in violation of law, and its decision was unsupported by substantial evidence, when it added a product-matching criterion for die-type in identifying Ferrara's "foreign like product." See Pl.'s Br. at 21.  Plaintiff furthermore argues that Commerce acted in a manner contrary to law when it did not include this criterion in its analysis of the other firms under review.  Id.  The Court discusses the two issues in turn below.

First, Commerce's decision to add a fifth product-matching criterion for die-type with regards to Ferrara was in accordance with law and supported by substantial evidence.  Congress has delegated to Commerce the ability to choose product-matching criteria to identify the "foreign like product" to which

domestic sales are compared in order to calculate the dumping margin.  See Pesquera Mares Australes, Ltda. v. United States, 266 F.3d 1372, 1384 (Fed. Cir. 2001); Koyo Seiko Co. v. United States, 66 F.3d 1204, 1209 (Fed. Cir. 1995).  However, in defining "foreign like product," Commerce is constrained both by statute and by its own past practice.  Under 19 U.S.C. § 1677(16)(A), Commerce must base product-matching criteria on "physical characteristics."  19 U.S.C. § 1677(16)(A).[18]  In

---

[18]The text of 19 U.S.C. § 1677(16) is as follows:

(16) Foreign like product

The term "foreign like product" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
        (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
        (B) Merchandise—
            (i) produced in the same country and by the same person as the subject merchandise,
            (ii) like that merchandise in component material or materials and in the purposes for which used, and
            (iii) approximately equal in commercial value to that merchandise.

        (C) Merchandise--
            (i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
            (ii) like that merchandise in the purposes for which used, and

addition, it is apparently Commerce's past practice, to consider only "meaningful" or "significant" physical characteristics. Emulsion Styrene-Butadiene Rubber from Mexico, 64 Fed. Reg. 14,872, 14,875 (Dep't Commerce Mar. 29, 1999) (notice of final determination of sales at less than fair value) (applying a "meaningful" standard); Certain Hot-Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom, 63 Fed. Reg. 18,879, 18,881 (Dep't Commerce Apr. 16, 1998) (final results of antidumping duty administrative review) (applying a "significant" standard). Commerce has defined what makes a physical characteristic "meaningful" or "significant" only by saying, in a notice applying the "meaningful" standard, that it looks to "both price differences in the marketplace and cost differences which may reflect different production processes." Emulsion Styrene-Butadiene Rubber from Mexico, 64 Fed. Reg. at 14,875; see also Certain Pasta from Italy, 67 Fed. Reg. 300, 302 (Dep't Commerce Jan. 3, 2002) (notice of final results of antidumping duty administrative review, partial rescission of antidumping duty administrative review and revocation of

_____

(iii) which the administering authority
determines may reasonably be compared with that
merchandise.

19 U.S.C. § 1677(16) (emphasis supplied).

antidumping duty order in part);[19] Certain Pasta from Italy, 64 Fed. Reg. 6,615, 6,623-24 (Dep't Commerce Feb. 10, 1999) (notice of final results and partial rescission of antidumping duty administrative review).

In the antidumping review at issue here, Commerce originally chose four criteria to use in identifying the foreign like product: pasta shape, wheat type, presence of additives, and presence of enrichment. Initial Questionnaire, P.R. Doc. No. 19, Pl.'s Pub. Ex. 9 at III-2. Ferrara, in answering its first questionnaire, requested that a fifth criterion be added, representing the type of die used to extrude the pasta. Ferrara's First Response, C.R. Doc. No. 3, Fiche 58 at Frames 26-27. In response to a supplemental questionnaire requesting explanation of why a fifth criterion should be added, Ferrara provided Commerce's verification, from the review conducted a year previously, that the surface texture of bronze-die and Teflon-die pastas were noticeably different. Ferrara's Second

---

[19]This final determination, Certain Pasta from Italy, 67 Fed. Reg. at 300, incorporates by reference an Issues and Decision Memorandum discussing cost differences and production differences in terms of physical difference. Certain Pasta from Italy, 67 Fed. Reg. at 302; Dep't of Commerce Mem. from Bernard T. Carreau, Deputy Assistant Sec'y for Imp. Admin. to Richard W. Moreland, Acting Assistant Sec'y for Imp. Admin., Issues and Decision Memorandum for the Fourth Antidumping Duty Administrative Review, Def.'s Conf. Ex. 7, at cmt. 2 (Jan. 3, 2002) ("Fourth Review Decision Memorandum").

Response, C.R. Doc. No. 35, Fiche 94 at Frames 7-9; Ferrara

Verification Report, C.R. Doc. No. 35, Ferrara's Conf. Ex. 2 at

1 (July 16, 2002) (stating that Ferrara's bronze-die pasta is

"rougher on the surface" than Teflon-die pasta).  This appears

to satisfy the statutory requirement that some physical

difference exist.

Other evidence that Ferrara provided related to the high

cost differential between production of bronze-die and Teflon-

die pasta, the slight differences in recipe, and evidence that

Amway, Ferrara's customer for bronze-die pasta, paid a premium

for pasta produced in that manner and prominently labeled the

product as bronze-die pasta.  Ferrara's Second Response, C.R.

Doc. No. 35, Fiche 94 at Frames 7-11; Verification Ex. 20:

Production Costs, C.R. Doc. No. 35, Ferrara's Conf. Ex. 3 (July

16, 2002); Production Control System Recipe Screenshots, C.R.

Doc. No. 35, Ferrara's Conf. Ex. 4 (July 16, 2002); Extracts

from HM Database & Package Labelling, C.R. Doc. No. 35,

Ferrara's Conf. Ex. 5 (July 16, 2002).  Production cost and

market price differences between pastas produced with the two

die-types appear to satisfy Commerce's own rule that the

physical difference be "significant" or "meaningful."

Plaintiff nevertheless argues that the fifth criterion

impermissibly reflects a non-physical characteristic.  Pl.'s Br.

at 22-26. Plaintiff's argument is that Commerce's definition of "significant" or "meaningful" physical characteristics hinges on production cost and marketing price, in violation of 19 U.S.C. § 1677(16)(A). Pl.'s Br at 24-25.[20] The Court agrees that by

_____

[20]The Court notes that neither Plaintiff nor Commerce use the term "physically significant" in their briefs, preferring the term "commercially significant," although the Court cannot divine from the Federal Register that Commerce has stated a practice of looking for "commercially significant" physical characteristics, rather than merely "significant" or "meaningful" physical characteristics. While the term appears in some Federal Register notices, and is occasionally used by Commerce to describe characteristics worthy of their own product matching criteria, the Court has not found any document wherein Commerce has explained that "commercial significance" is its standard, nor what "commercially significant" physical characteristics would be. Plaintiff, however, argues that past practice requires Commerce to only consider "commercially significant" physical characteristics in creating product matching-criteria. Pl.'s Br. at 22-23. Plaintiff cites as proof of this practice the Federal Circuit's decision in Pesquera Mares Australes. Pl.'s Br. at 23 n.70.

In that case, Commerce asked the Federal Circuit to uphold as reasonable Commerce's interpretation of the statutory phrase "identical in physical characteristics" in accord with commercial practice. Pesquera Mares Australes, Ltda. v. United States, 266 F.3d at 1372. The Court notes that the phrase "commercially significant" appears nowhere in that decision. See id. Rather, the Federal Circuit opined that the words "identical in physical characteristics" as used in 19 U.S.C. § 1677(16)(A) could reasonably be held to mean "the same with minor differences," rather than absolutely physically identical. Id. at 1383. This was in part due to the fact that there may be hundreds of small variations between any two given products, and Commerce would never be able to match an imported product with a "foreign like product" if it were required to evaluate every possible difference. Id. (citation omitted). Therefore, the Federal Circuit held that Commerce could ignore differences that were not "commercially recognized" in making product-matching criteria. Id. at 1384. This, however, is different from

statute, Commerce is required to match only "physical" characteristics. 19 U.S.C. § 1677(16)(A). The statute, however, does not require that physical characteristics be significant and, generally, Commerce has wide latitude in choosing what physical characteristics to consider. Pesquera Mares Australes, Ltda. v. United States, 266 F.3d 1372 at 1384. Additionally, Commerce has established a practice of considering only "significant" or "meaningful" physical characteristics, defined in terms of cost and price differences, which appear to be non-physical attributes of a good. Consequently, Commerce's practice could appear inconsistent with the statute; were Plaintiff able to demonstrate that the verified physical difference between bronze-die and Teflon-die pasta, i.e., surface texture, is actually inconsequential to the purchaser, it could claim that the cost difference is propelled by a consumer preference for the production method alone. In that case, Commerce's findings here could be contrary to law, as the decision to create a fifth product-matching criterion would

_requiring_ Commerce to ignore commercially unrecognized differences, or, to put it another way, from requiring that Commerce prove that a difference is "commercially recognized" when choosing product-matching criteria. Pesquera Mares Australes does not so hold. Moreover, the case does not, in of itself, create a past practice of only relying on "commercially significant" characteristics, but rather states that it is reasonable for Commerce to ignore minor characteristics if it so chooses.

appear to be based entirely on non-physical attributes. However, Plaintiff has adduced no such evidence; the record contains no evidence whatsoever on whether the surface texture, standing alone, and unaided by cost or production method, is significant to consumers or not.[21]   However, the record does disclose a verified physical difference between bronze-die and Teflon-die pasta, and that the two are markedly different in terms of price and cost to produce.   That being so, it appears that Commerce has satisfied both the requirements of 19 U.S.C. § 1677(16)(A) and the requirement of its own practice of relying only on "meaningful" or "significant" physical characteristics.

The next question is whether Commerce's decision was supported by substantial evidence.  Responding to the second supplemental questionnaire, Ferrara produced the verification report and exhibits from the review conducted a year earlier regarding treatment of Ferrara on the same issue, and in which Commerce added a fifth matching criterion for die-type.  See Ferrara's Second Response, C.R. Doc. No. 35, Fiche 94 at Frames 7-9.   In the verification conducted during the fourth review,

---

[21]Ferrara has introduced evidence that its customer for bronze-die pasta, Amway, prominently advertises the product as such, but this does not inform us as to whether it is the bronze die process, or the resulting physical differences that Amway finds attractive. See Extracts from HM Database & Package Labelling, Ferrara's Second Response Ex. 4, C.R. Doc. No. 35, Ferrara's Conf. Ex. 5 (July 16, 2002).

Commerce found and verified an actual physical difference

between bronze-die and Teflon-die pasta; i.e., surface texture.[22]

_____

[22]Commerce also argues that record evidence shows throughput
rates and line speeds differ for bronze-die and Teflon-die
pasta, and that this makes for a physical difference. See Def.'s
Br. at 23; see also Decision Memorandum, P.R. Doc. No. 134,
Pl.'s Pub. Ex. 2 at 23 (implicating throughput rate and line
speeds in either a physical or cost difference, or both); Fourth
Review Decision Memorandum, Def.'s Conf. Ex. 7 at cmt. 2.
Record evidence shows that throughput rates and line speeds for
bronze-die pasta are slower than those for Teflon pasta. See,
e.g., Ferrara Verification Report, C.R. Doc. No. 3, Ferrara's
Conf. Ex. 2 at 15.
     While Commerce does not explain how line speed or
throughput rates implicate a physical difference in either the
Decision Memorandum or the Fourth Review Decision Memorandum, it
does cite to past pasta reviews in which a fifth matching
criterion was added.  Decision Memorandum, P.R. Doc. No. 134,
Pl.'s Pub. Ex. 2 at 23 (citations omitted); Fourth Review
Decision Memorandum, Def.'s Conf. Ex. 7, at cmt. 2 (citing
Certain Pasta from Italy, 64 Fed. Reg. 6,615 (Dep't Commerce
Feb. 10, 1999) (notice of final results and partial rescission
of antidumping duty administrative review); Certain Pasta from
Turkey, 65 Fed. Reg. 77,857 (Dep't Commerce Dec. 13, 2000)
(final results of antidumping duty administrative review)).  One
of these cases appears to indicate that in past reviews,
Commerce used line speed as a descriptor for pasta shape, as it
is the different speeds at which pastas are run through the die
that give them their different lengths and thicknesses.  Certain
Pasta from Italy, 64 Fed. Reg. at  6,623-24.  There is also
other evidence on the record that appears to show that line
speed is a shorthand for shape.  See, for example, Initial
Questionnaire, P.R. Doc. No. 19, Pl.'s Pub. Ex. 9 at III-3,
which asks respondents to support shape classifications with
line speed, and Letter from Paul C. Rosenthal et al., to Sec'y
Commerce, Re: Certain Pasta From Italy, C.R. Doc. No. 32, Fiche
92 at Frames 36-37, 52, 61-63, and 65-67 (Jun. 7, 2002),
explaining that line speeds reflect the shape and size of pasta.
Therefore, it may be that in addition to the surface texture,
bronze-die pasta differs from Teflon-die pasta in its length and
thickness, and that it is this fact Commerce is trying to
describe in its discussions of line speed and throughput rates.

Ferrara Verification Report, C.R. Doc. No. 3, Ferrara's Conf.

Ex. 2 at 1.  It also verified the different costs of production

and different market prices.  Id.  While Plaintiff claims that

Commerce should not rely on evidence that was not produced in

response to the particular review at hand, the Court cannot say

that Commerce's decision was unsupported by substantial

evidence, or that it is unreasonable for Commerce to rely on

---

There is language from Commerce in a review previous to the one
at issue in this case, however, that seems to indicate that
throughput rates and line speeds do not reflect a physical
difference so much as a cost difference:

> The fact that a long or short artiginal pasta [bronze
> die pasta made with coarse semolina] cut takes up to
> 20 times longer to produce than the comparable
> industrial long or short pasta cut is sufficiently
> significant to warrant the creation of a special shape
> category for artiginal pasta long or short cuts for
> the same reason that led [Commerce] to create
> speciality [sic] long and short shapes for industrial
> pasta long or short cuts; in other words, the
> production cost for artiginal pasta is significantly
> influenced by the slower line speeds required to
> produce the same long or short industrial pasta cut.

Certain Pasta from Italy, 64 Fed. Reg. at 6,624.
        The record before the Court here is unclear on whether line
speed in this case primarily affects shape and, in turn, cost,
or whether it is primarily a matter of cost that does not
reflect a different pasta shape.
        Be that as it may, there is at least one verified physical
difference between Ferrara's bronze-die and Teflon-die pasta --
texture. Ferrara Verification Report, C.R. Doc. No. 3, Ferrara's
Conf. Ex. 2 at 1.  This difference was verified and, on this
record, provides a reasonable basis for fulfilling the statutory
requirement that product-matching be based on physical
characteristics.  See 19 U.S.C. § 1677(16)(A).

evidence prepared by its own personnel only a year before. Moreover, Ferrara provided certain new evidence relating to production recipes and Amway's promotion of the bronze-die product to support its bid for a fifth product-matching criterion. Production Control System Recipe Screenshots, C.R. Doc. No. 35, Ferrara's Conf. Ex. 4 (July 16, 2002); Extracts from HM Database & Package Labelling, C.R. Doc. No. 35, Ferrara's Conf. Ex. 5 (July 16, 2002)

The final issue in the case is whether Commerce acted with support of law and substantial evidence when, having added the die-type criterion to the "foreign like product" with regards to Ferrara, it did not add it for the other companies under review. In support of the argument that this decision was not in accordance with law, Plaintiff appears to cite inapposite cases. Pl.'s Br. at 21 n.63. The cases deal not with variations in product-matching criteria between reviewed companies in an investigation, but with Commerce's having given the phrase "foreign like product," as it appears in various places in the dumping statutes, different meanings without explanation. See RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1346-47 (Fed. Cir. 2002); SKF USA Inc. v. United States, 263 F.3d 1369, 1382-83 (Fed. Cir. 2001). These cases do no more than defend a basic canon of statutory construction, and factually, do not appear to

have application to the issues here, which involve the use of criteria to define a certain category of pasta, rather than a shifting meaning of the phrase "foreign like product" across statutory sections.    Moreover, with regard to substantial evidence, Plaintiff appears to render its own argument moot when it admits that none of the other companies ever reported the use of bronze dies.  Pl.'s Br. at 26.  Requiring companies to report on a characteristic that their pasta does not have would be superfluous indeed.[23]    The Court's review of the applicable statutes and regulations does not reveal any reason why Commerce should be barred from using a product-matching criterion solely in relation to the one company under review to which it has application.

---

[23]Any argument that the other reviewed companies may also have been making bronze-die pasta, but were unaware of their ability to request a product-matching criterion is undermined by the fact that Commerce has added a fifth product-matching criterion for die-type for certain companies in past pasta reviews.  For example, in the Fourth Antidumping Review of Certain Pasta from Italy, Commerce added a die-type criterion solely for Ferrara, the same company at issue here.  See Fourth Review Decision Memorandum at cmt. 2.  Similar results were obtained in an earlier pasta review, where a fifth criterion was added for just one respondent.  See Certain Pasta from Italy, 64 Fed. Reg. at 6,623-24.

**CONCLUSION**

Because Commerce's review of both Garofalo and Ferrara was in accordance with law and supported by substantial evidence, the Court will deny Plaintiff's motion for judgment upon the agency record, and enter judgment for Defendant.


                                        /s/ Donald C. Pogue

                                        Donald C. Pogue

                                        Judge



Dated:     New York, New York

           March 1, 2004